[No. A057152. First Dist., Div. Four. June 10, 1993.]

FIBREBOARD CORPORATION, Plaintiff and Appellant, v. HARTFORD ACCIDENT AND INDEMNITY COMPANY, Defendant and Respondent.

496

COUNSEL

Brobeck, Phleger & Harrison, Robert M. Chilvers, Jayne Loughry and David E. Weiss for Plaintiff and Appellant.

Hill, Wynne, Troop & Meisinger, Kirk A. Pasich, Wendy I. Kirchick and Linda D. Kornfeld as Amici Curiae on behalf of Plaintiff and Appellant.

Meadows, Lenker, Sterling & Davis, Kirlin, Campbell, Meadows & Keating, Stephen G. Flynn, Hogan & Hartson, William J. Bowman and Patrick F. Hofer for Defendant and Respondent.

Bien, Summers & Dale, Elliot L. Bien, Wiley, Rein & Fielding, Thomas W. Brunner, Laura A. Foggan, Carol A. Barthel and Jo Anne B. Hennigan as Amici Curiae on behalf of Defendant and Respondent.

OPINION

ANDERSON, P. J.—This appeal involves matters of insurance coverage for numerous asbestos-in-building claims asserted against appellant Fibreboard

Corporation (Fibreboard). We are asked to decide three issues: (1) whether causes of action based on collective liability, in which a given defendant need not have supplied the harmful product, come within the policies' "products hazard" coverage; (2) whether such causes fall within the general operations coverage; and (3) whether the personal injury coverage applies to certain other claims alleging interference with property rights and related matters.

We conclude that all the underlying claims, if covered at all, are embraced within the "products hazard" coverage, which has either been exhausted or rendered inapplicable by means of an asbestos exclusion. Further, the general operations and personal injury provisions do not apply to the underlying claims. Accordingly, we affirm the judgment in its entirety.

## I. BACKGROUND

### A. *Litigation Background*

From 1928 until 1972 Fibreboard manufactured and sold products containing the mineral asbestos. During the past decade more than 150 claims have been asserted against Fibreboard and other manufacturers of asbestos products by school districts, municipalities, other government entities and private building owners, alleging damages and injury because of the presence of defendants' asbestos products in their buildings. Those claims now number 42.

Typically, plaintiffs advance theories of negligence, strict liability, nuisance, breach of warranties, misrepresentation, enterprise liability, market share liability, concert of action and civil conspiracy. Typically, they seek damages related to the costs of inspection, containment, removal, replacement, relocation and other corrective action regarding asbestos products in these buildings, as well as punitive damages.

From 1973 through 1986 Hartford was the primary general liability insurer for Louisiana-Pacific Corporation, Fibreboard's parent. Louisiana-Pacific acquired Fibreboard in 1978 and added the subsidiary to its then-current Hartford policy by amendatory endorsement effective October 1, 1978.

Hartford and Fibreboard first became embroiled in litigation over insurance coverage for asbestos-related bodily injury claims shortly after Fibreboard became an insured under Louisiana-Pacific's policies. In 1985 the parties, together with other asbestos producers and insurers entered into a

comprehensive settlement agreement (the Wellington Agreement) designed to resolve all issues pertaining to insurance coverage for these suits.

Later, in 1985, after the Wellington Agreement had been signed, Fibreboard filed this declaratory relief action against numerous insurance companies, including Hartford, to resolve coverage issues pertinent to the asbestos-in-buildings claims. Fibreboard, through its attorney, represented that at that time the company was not seeking contribution from Hartford and had "no intention" of serving Hartford with the complaint.

Then, in 1988, pursuant to the "Wellington Agreement," Hartford paid $2 million on its 1978-1979 and 1979-1980 policies for judgments or settlements of asbestos bodily injury claims. At that time Hartford gave notice to Fibreboard that these payments exhausted the combined "products hazard" aggregate limits for the two policies in question.

Against this background, Hartford requested that Fibreboard dismiss this case and then moved for summary judgment after receiving no response. Based on amendments to Fibreboard's complaint, alleging facts from which it asserted new theories of coverage, the trial court denied Hartford's motion. After conducting some discovery, Hartford again moved for summary judgment, this time successfully.

## B. The Hartford Policies

Fibreboard is demanding coverage under Hartford policies in effect from 1978 through 1985. Pursuant to these policies, Hartford undertook to pay on behalf of Fibreboard "all sums which the insured shall become legally obligated to pay as damages because of: [¶] (1) bodily injury or property damage to which the insurance applies caused by an occurrence or [¶] (2) personal injury to which this insurance applies. . . ." The annual $1 million aggregate limits of liability for bodily injury and property damage under these policies apply separately to each of several situations, including the following: "(1) all property damage arising out of premises or operations . . . [and] (3) all bodily injury or property damage included within the products hazard and all property damage or bodily injury included within the completed operations hazard."

The "products hazard" classification is defined as including "bodily injury and property damage arising out of the named insured's products[1] or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs away from premises owned by or rented to the named insured and after physical possession of such products has been relinquished to others."

Beginning with policies effective April 1, 1980, and for all policy years thereafter, each policy contained a special asbestos exclusion which provided that the insurance does not apply "to bodily injury or property damage included within the completed operations or the products hazard for claims arising out of products containing asbestos manufactured by Fibreboard Corporation commonly referred to as 'asbestos claims.' "

The policies in question also provided a separate aggregate limit of liability for "personal injury" claims. The policies define "personal injury" as "injury, other than advertising injury, arising out of one or more of the following offenses committed during the policy period in the conduct of the insured's business: [¶] 1. the publication or utterance of a libel or slander or of other defamatory or disparaging material, or a publication or utterance in violation of any individual's right of privacy; [¶] 2. false arrest, detention or imprisonment, or malicious prosecution; [¶] 3. wrongful entry or eviction or other invasion of an individual's right of privacy; or [¶] 4. discrimination or humiliation . . . ."

## II. DISCUSSION

### A. *Introduction*

There are no disputed facts. The gist of Fibreboard's appeal is that the trial court misinterpreted the insurance policies, which led to erroneous conclusions concerning coverage. Our job is to affirm the summary judgment if, as is the case, there are no triable issues of material fact *and* the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) We use our independent judgment in deciding purely legal questions such as the interpretation of written instruments.

Fibreboard complains that the trial court had it wrong when it ruled that all the underlying asbestos-in-buildings claims were products claims which, if covered at all, would come within the "products hazard" limits of liability.

[1]The term "named insured's products" is defined as "goods or products manufactured, sold, handled or distributed by the named insured or by others trading under his name . . . ."

The court found that those limits were exhausted under the 1978 and 1979 policies and that the asbestos products exclusion present in the later policies applied to the remaining claims.

It is Fibreboard's contention that many of the underlying claims are not subject to the "products hazard" limitation because they do not allege damages "arising out of" Fibreboard's products. They assert that claims based on theories such as concert of action, failure to disclose hazardous nature of products, civil conspiracy, failure to develop asbestos-free products and market share liability have "nothing to do with any product manufactured, sold, handled or distributed by Fibreboard" and, thus, are not subject to the limits of liability for "products hazard." This being the case, Fibreboard insists there is coverage under the "premises-operations" clause as well as under the personal injury provisions. After examining the insuring provisions for property damage/bodily injury and personal injury, we conclude the trial court correctly ruled on Hartford's summary judgment motion.

### B. *The Underlying Claims, If Covered at All, Fall Within Hartford's Bodily Injury/Property Damage Coverage Under the "Products Hazard" Classification*

#### (1) *Background*

The Hartford policies provide property damage and/or bodily injury coverage for distinct hazards related to Fibreboard's business as a manufacturer. We are concerned here with the separate coverage which the premiums afford for "premises-operations" and for "products hazard/completed operations." Under the policies, the annual $1 million aggregate cap on liability applies separately to each category.

As explained by a noted commentator, a manufacturer or person who performs a service can incur liability in a number of ways, including "(1) while work is in progress, [and] (2) after completion . . . . An injury or loss may result while an activity is in progress, and prior to the completion thereof, either as a result of an act of negligence or an omission. Such liability is embraced within the ordinary liability aspect of a public liability policy under coverage for premises-operations. [¶] . . . [O]nce a product has been completed and sent to market . . . liability may be incurred by reason of a defect in merchandise or improper workmanship. It should be clear that the premises-operations coverage is not appropriate coverage and the individual now needs 'products liability' or 'completed operations' coverage. The coverages are complementary and not overlapping . . . ." (7A Appelman, Insurance Law & Practice (1979) § 4508, pp. 340-341.) Thus, as a

matter of sequencing, "it is well to recognize that products liability is a coverage that takes over where premises-operations leaves off . . . ." (*Id.*, at p. 340; *Lindley Chemical* v. *Hartford Acc. & Indem.* (1984) 71 N.C.App. 400 [322 S.E.2d 185, 187].)

### (2) Scope of "Products Hazard" Clause: Traditional Products Liability Claims

What, then, is the scope of a products hazard clause? More than 20 years ago this court decided a case involving a products hazard *exclusionary* clause phrased in language quite similar to the pertinent coverage provision at issue here. (*Cravens, Dargan & Co.* v. *Pacific Indem. Co.* (1972) 29 Cal.App.3d 594 [105 Cal.Rptr. 607].)[2] There, the insured, Moyer Chemical, recommended and sold an insecticide which damaged a farmer's seedling tomato crop. Pacific Indemnity, one of the liability insurers, specifically excluded "products hazard" from the scope of coverage. The other insurers unsuccessfully sought indemnity and declaratory relief against Pacific Indemnity.

The trial court concluded that the insecticide was defective and that the defect directly caused the damage. It apparently determined Pacific Indemnity was not liable for indemnity on the basis of the exclusionary "products hazard" clause.

The appellants tried on various arguments to evade the exclusionary clause and land within the general liability coverage under general negligence principles. For example, they emphasized that Moyer recommended, but did not actually manufacture, the product in question. Further, Moyer failed to test the product and failed to warn about its effect on seedlings.

We found the "products hazard" provision controlling, first pointing out that the clause was "clear and positive." (*Cravens, Dargan & Co.* v. *Pacific Indem. Co.*, *supra*, 29 Cal.App.3d at p. 599.) We held that all the acts and omissions attributed to Moyer were part of the integrated but excluded process of manufacture, handling and sale. (*Id.*, at pp. 599-602.) Only acts "sufficiently removed from the quality of the product in question" would escape the exclusionary provision. (*Id.*, at p. 601.) In contrast, the whole

---

[2]The policy defined "products hazard" as " '. . . [g]oods or products manufactured, sold, handled or distributed by the named insured or by others trading under his name if the accident or occurrence occurs after possession of such goods or products has been relinquished to others by the named insured or by others trading under his name if such action or occurrence occurs away from premises owned, rented, or controlled by the named insured.' " (29 Cal.App.3d at pp. 596-597.)

process of failing to warn about, and positively recommending, a product "was so merged as to fall within the kind of liability which the insured decided not to pay for when purchasing defendant's policy." (*Ibid.*)

In a similar vein, the court in *Aetna Casualty & Surety Co.* v. *Richmond* (1977) 76 Cal.App.3d 645, 654-655 [143 Cal.Rptr. 75] held that negligence of the insured's employees in selecting and adjusting ski bindings contributed to the defect in the product and did "not exempt the cause of damages from the products liability exclusion." The court went on to observe that products cases almost always involve some preexisting negligence, concluding that " '. . . if the allegation of pre-existing negligence were to be regarded as controlling, the result would be to emasculate the product liability exclusion.' " (*Id.*, at p. 655.)

So, too, an Oregon reviewing court has held that products hazard coverage applies to any claim for damages arising from a product, including claims based on failure to warn, negligent design, and representations about the product. (*Laminated Wood Products* v. *Pedersen* (1985) 76 Ore.App. 662 [711 P.2d 165, 170].)

Within the framework of the Hartford policies and the continuum of coverage provided for liability stemming from operations and products, it is obvious that the traditional products claims in the underlying complaints, namely, those asserting negligent testing, design, manufacture and sale; strict liability for design and manufacturing defects; failure to warn; breach of warranties; misrepresentation and the like, are within the four walls of the "products hazard" clause.

Conversely, these traditional products claims would not be covered by the operations-premises clause. This would be so even where the tortious conduct was a failure to warn about the dangers of asbestos, because it is precisely the conduct of failing to warn that renders the product defective and, hence, calls into play the "products hazard" clause. (See *Anderson* v. *Owens-Corning Fiberglas Corp.* (1991) 53 Cal.3d 987, 995 [281 Cal.Rptr. 528, 810 P.2d 549] [strict liability invoked for " 'warning defects,' i.e., inadequate warnings or failures to warn"].)

(3) *Scope of "Products Hazard" Clause: Collective Liability Claims*

The real issue in this case is whether more sophisticated products liability theories—those focussing on industry-wide tortious behavior in manufacturing and marketing defective products where any individual manufacturer's product may not be the proximate cause of plaintiff's injury—are within the

umbrella of either the "products hazard" or the premises-operations clauses. Fibreboard claims that concert of action, conspiracy and certain market share causes of action are not within the "products hazard" clause but are embraced within the operations coverage. Hartford argues the opposite on each point.

■ Fibreboard insists that the "products hazard" clause is in the nature of an exclusion which limits coverage, that it is ambiguous, and should be construed against Hartford. We realize that in the context of this lawsuit, the products hazard coverage does not afford protection for most asbestos-in-buildings claims because two years into their contractual relationship the parties agreed to an endorsement excluding claims arising out of asbestos products manufactured by Fibreboard. But within the structure of the policies the exclusionary language goes to a particular product, not to the products coverage in general. Indeed, the "products hazard" is one of the classifications to which the liability limits for coverage for bodily injury and property damage apply. Therefore, our job is to give effect to the "products hazard" clause as a term of coverage.

In doing so, we are mindful that the overarching goal of contract interpretation is to honor the parties' mutual intentions as of the time of contracting. (Civ. Code, § 1636.) ■ "Where contract language is clear and explicit and does not lead to an absurd result, we ascertain this intent from the written provisions and go no further. [Citations.] The words of a contract generally are to be understood in their ordinary and popular sense unless the parties use them in a technical sense or 'a special meaning is given to them by usage . . . .' " (*Helfand* v. *National Union Fire Ins. Co.* (1992) 10 Cal.App.4th 869, 879 [13 Cal.Rptr.2d 295].)

As we explain, we agree with Hartford that the collective liability claims, if covered at all, would fall within the "products hazard" provision. ■ We do not find the "products hazard" term and, in particular, the "arising out of the insured's products" language to be ambiguous. As the trial court noted, these words are words of broader significance than "caused by." We agree: California courts generally have given the terms "arising out of" or "arising from" their commonsense meaning, concluding that they connote more than mere causation. For example, our Supreme Court has explained that California cases have established that the "arising out of the use" language found in insuring clauses of automobile liability policies "has broad and comprehensive application, and affords coverage for injuries bearing almost *any* causal relation with the vehicle." (*State Farm Mut. Auto. Ins. Co.* v. *Partridge* (1973) 10 Cal.3d 94, 100 [109 Cal.Rptr. 811,

514 P.2d 123].) The court went on to state that "[s]ome minimal causal connection between the vehicle and the accident is, however, required." (*Id.*, at p. 100, fn. 7.) So, too, other cases have equated "arising out of" with " '. . . origination, growth or flow[ing] from the event.' " (See *Hartford Accident & Indem. Co.* v. *Civil Service Employees Ins. Co.* (1973) 33 Cal.App.3d 26, 32 [108 Cal.Rptr. 737]; *Pacific Indem. Co.* v. *Truck Ins. Exch.* (1969) 270 Cal.App.2d 700, 704 [76 Cal.Rptr. 281].) As summed up by a federal court applying California law to determine the scope of an exclusionary clause and the key concept of "arising from" or "arising out of": " ' "Arising out of" are words of much broader significance than "caused by." They are ordinarily understood to mean "originating from" "having its origin in," "growing out of" or "flowing from" or in short, "incident to, or having connection with". . . .' " (*Continental Cas. Co.* v. *City of Richmond* (9th Cir. 1985) 763 F.2d 1076, 1080.)

Fibreboard calls our attention to the more recent case of *Farmers Ins. Exchange* v. *Reed* (1988) 200 Cal.App.3d 1230 [248 Cal.Rptr. 11], in which the reviewing court interpreted language in an automobile liability policy obligating the insurer to "pay damages for which any insured person was legally liable 'because of bodily injury to any person . . . arising out of the . . . use of a private passenger car . . . .' " (At p. 1232.) Focusing on the concept of "use," the court indicated that use of the car "must be a ' "predominating cause" ' or a ' "substantial factor" ' in causing the injury." (*Id.*, at p. 1233.)

More pertinent factually, Fibreboard also cites an Ohio case which held: "Unless it is shown that the damages were caused by the insured's product, products liability principles, and therefore, the products hazard exclusion, does not apply to exclude coverage." (*Buckeye Union Ins.* v. *Liberty Solv. & Chem.* (1984) 17 Ohio App.3d 127 [17 Ohio B.R. 225, 477 N.E.2d 1227, 1237], concluding the exclusion did not bar liability under the federal "Superfund Act" because Superfund liability arises by reason of the defendant's status as a generator of hazardous waste products, not by reason of a defective condition in the product; disagreed with on another point in *Hybud Equip.* v. *Sphere Drake Ins.* (1992) 64 Ohio St.3d 657 [597 N.E.2d 1096].)

Here, of course, each claim will require proof that Fibreboard's products were defective. More to the point, by tendering the issue as one of causation, Fibreboard misses the mark. The policies predicate coverage on the insured's legal liability to pay damages because of bodily injury or property damages "arising out of the named insured's products." In this context, the phrase "arising out of" "does not 'purport to regulate the theory of liability or the

standard of causation . . . .'" (*State Farm Fire & Casualty Co.* v. *Salas* (1990) 222 Cal.App.3d 268, 274, fn. 4 [271 Cal.Rptr. 642]; see also *Transport Indemnity Co.* v. *Schnack* (1982) 131 Cal.App.3d 149, 151-152 [182 Cal.Rptr. 256].) Rather, it identifies a core factual nucleus, i.e., products manufactured, sold or distributed by the insured, and links that nucleus to the bodily injury or property damage covered under the policy. This link is not made in terms of tort causation. Tort causation is assumed within the requirement of the general insuring clause that the insured be found legally liable to pay damages. (*State Farm Fire & Casualty Co.* v. *Salas, supra,* 222 Cal.App.3d at p. 274, fn. 4.) The "arising out of" embellishment then broadly links the insureds' products with the resulting bodily injury or property damage.

We come to the obvious: the gravamen of all the underlying complaints is that Fibreboard manufactured, sold and distributed defective asbestos products. All allege damage to property and the threat of harm to the health of those who use the plaintiff's buildings which contain these products. Beyond these core product allegations, the complaints posit various levels of wrongful behavior on the part of the manufacturers. These include intentional failure to reveal risks; joint efforts with other industry members to suppress information regarding dangers of asbestos products and to market same without adequate testing or warnings; conspiracy to do the same. We turn now to the particulars of each of the theories of liability which Fibreboard claims remove certain actions from "products hazard" coverage.[3]

---

[3]In its reply brief Fibreboard contends that it has alluded to certain specific types of claims as falling outside the scope of products hazard, but that these are just examples. Variations on these theories may be asserted, and Fibreboard seems to be "reserving" its right to say these potential claims are also outside the scope. We of course analyze Hartford's duty only with respect to the specific claims and specific points discussed on appeal and within the four corners of the forty-two underlying complaints.

We note that one complaint asserts a cause of action under the Superfund Act. Amicus curiae mentioned the issue, but Fibreboard did not brief it. Hartford has deemed the matter waived, and Fibreboard did not contest this understanding in its reply brief. We deem the matter waived.

Fibreboard also mentions, without citation to authority or to the record, that allegations concerning failure to disclose to purchasers of other manufacturers' products that asbestos is hazardous, and failure to develop asbestos-free products are claims having "nothing to do" with any product that Fibreboard manufactured or sold. The first set of allegations is within the various conspiracy and concerted action claims. Failure to develop asbestos-free products is but the flip side of having made, and being subject to liability for having made, a defective asbestos-containing product; this allegation poses no independent theory which we must independently analyze.

Finally, we note that amicus curiae in support of Fibreboard argues that any liability for failure to warn is outside the products hazard clause. The two cases which amicus curiae cites are inapposite or suspect. In the first, *Cooling* v. *United States Fidelity and Guaranty Co.*

### (a) *Concert of Action*

■ Concert of action claims were alleged in complaints filed in a number of states. This theory seeks "to deter hazardous group behavior." (*Abel* v. *Eli Lilly and Co.* (1984) 418 Mich. 311 fn. 19 [343 N.W.2d 164, 176 ].) Fibreboard's argument is that in some jurisdictions, a defendant can be held liable for damages caused by *another's* product because it is the tortious conduct of the group which is deemed to cause the harm to plaintiff, not any one manufacturer's particular product. For example, under Michigan law, "[a] plaintiff may proceed on the theory of concert of action if he or she can prove 'that all defendants acted tortiously pursuant to a common design' . . . . 'Even if defendant caused no harm himself, he is liable for the harm caused by his fellows because he acted jointly.' [Citation.] '[T]o state a cause of action, a plaintiff need only allege that the defendants were jointly engaged in tortious activity as a result of which the plaintiff was harmed.' " (*Cousineau* v. *Ford Motor Co.* (1985) 140 Mich.App. 19 [363 N.W.2d 721, 728].)

As the Michigan Supreme Court explained: "This theory, although not developed to ease plaintiff's traditional burden of proof of causation, may have that effect. If plaintiffs can establish that all defendants acted tortiously pursuant to a common design, they will all be held liable for the entire result. [¶] The concept is perhaps most clearly illustrated in the racing context. If three drivers join in a drag race, as a result of which one pedestrian is injured, all three may be held liable. *Thus a legal fiction is created: all three drivers are found to be the cause in fact, although only one driver may have actually struck the pedestrian.*" (*Abel* v. *Eli Lilly and Co., supra,* 343 N.W.2d at p. 176, italics added.) This court went on to find that the plaintiffs had stated a cause of action for concert of action based on allegations that "defendants acted together in negligently manufacturing and promoting drugs which were ineffective and dangerous, were inadequately tested, and were distributed without sufficient warnings." (*Ibid.*)

In the context of the underlying claims, the group is manufacturers of products containing asbestos. The hazardous behavior is producing, promoting, selling and supplying asbestos-containing products without conducting adequate testing, without providing adequate warnings, etc. Because Fibreboard is alleged to be part of this concerted, hazardous group effort, its

---

(La.Ct.App. 1972) 269 So.2d 294, 297-298, the court concluded that the product was not defective, and the alleged failure to warn of the need for including safety devices was in the nature of a general risk of doing business. Here, the asbestos products *are defective* precisely because of the absence of warning about their dangers. The second case (*Scarborough* v. *Northern Assur. Co. of America* (5th Cir. 1983) 718 F.2d 130) applies Louisiana law and, accordingly, relies on *Cooling.*

conduct in manufacturing and marketing asbestos-containing products would be deemed to be the cause in fact of property damages to "X" school even if its products were not installed in "X" school. Under the legal fiction of this theory, plaintiff's injuries indeed "arise out of" Fibreboard's products.

### (b) Civil Conspiracy

Civil conspiracy claims have been brought against Fibreboard in Texas, California and other jurisdictions. Typical allegations are that pursuant to agreement with other manufacturers, Fibreboard suppressed information about the dangers of asbestos and marketed asbestos-containing products without adequate testing or warning. In a leading case involving cigarette manufacturers, the reviewing court explained the scope of liability for civil conspiracy: "Appellees' basic position is that a single cigarette manufacturer has a duty to inform *only* the users or consumers of any hazards associated with the use of its own products and that, under no circumstances, would a cigarette manufacturer's duty to warn, extend to the users of a competitor's product. We disagree. . . . [¶] . . . [T]he law of civil conspiracy makes non-supplying cigarette manufacturers, subject to liability for failure to warn cigarette smokers of the dangers of cigarette smoking . . . ." (*Rogers* v. *R.J. Reynolds Tobacco Co.* (Tex.Ct.App. 1988) 761 S.W.2d 788, 797.)

" 'The elements of an action for civil conspiracy are the formation and operation of the conspiracy and damage resulting to plaintiff from an act or acts done in furtherance of the common design. . . . In such an action the major significance of the conspiracy lies in the fact that it renders each participant in the wrongful act responsible as a joint tortfeasor for all damages ensuing from the wrong, irrespective of whether or not he was a direct actor and regardless of the degree of his activity. [Citations.]' " (*Doctors' Co.* v. *Superior Court* (1989) 49 Cal.3d 39, 44 [260 Cal.Rptr. 183, 775 P.2d 508].)

Analytically, as with the concert of action theory, liability for civil conspiracy permits the legal fiction that each conspiring defendant legally caused plaintiff's injuries even though only one defendant may be the direct actor causing the specific harm. Thus, under a civil conspiracy action, Fibreboard could be legally liable for property damage and bodily injury even though its particular product was not incorporated in plaintiff's building. It is nonetheless as if Fibreboard's products caused the harm and, thus, the harm arises from, flows from, and originates from Fibreboard's products.

### (c) Market Share Liability

Unlike the substantive law of California, market share liability in certain jurisdictions can be imposed even if a defendant could prove that its product

did not contribute to plaintiff's injury.[4] New York is such a jurisdiction, and Fibreboard has been sued there. In a recent case against manufactures of the drug "DES," the New York high court adopted a market share theory using a national market and further explained: "[B]ecause liability here is based on the over-all risk produced, and not causation in a single case, there should be no exculpation of a defendant who, although a member of the market producing DES for pregnancy use, appears not to have caused a particular plaintiff's injury. It is merely a windfall for a producer to escape liability solely because it manufactured a more identifiable pill, or sold only to certain drugstores. These fortuities in no way diminish the culpability of a defendant for marketing the product, which is the basis of liability here." (*Hymowitz* v. *Eli Lilly and Co.* (1989) 73 N.Y.2d 487 [541 N.Y.S.2d 941, 950, 539 N.E.2d 1069].)

In a *Hymowitz* situation a defendant manufacturer will have to pay the plaintiff for injuries suffered from a generic product on the basis of its share of a defined market for that product, regardless of whether it can establish it did not cause the harm. ■ Again, because of its culpability in creating the market by producing and selling its own products, a given producer will be treated as if it caused a portion of an injury even when it can disprove causation. Liability stems from the defendant's products and, thus, falls within the "products hazard" coverage.

### (4) There Is No Coverage for Products Claims Under the Premises-operations Clause

■ Having said all this, even if we were to agree with Fibreboard that these industry-wide liability claims are not products claims within the meaning of the "products hazard" clause, they would not repose within the operations-premises clause. Fibreboard urges that since the policies do not define the term "operations," we should construe it strictly against the insurer to include all of Fibreboard's behavior and activities related to "manufacturing, selling or distributing goods or products." It points to the definition of "foreign based operations" which includes "manufacturing,

---

[4]California has adopted a burden shifting approach to market share liability: each defendant facing liability on this basis is responsible for a proportion of the judgment represented by the share of the relevant market "unless it demonstrates that it could not have made the product which caused plaintiff's injuries." (*Sindell* v. *Abbott Laboratories* (1980) 26 Cal.3d 588, 612 [163 Cal.Rptr. 132, 607 P.2d 924, 2 A.L.R.4th 1061].) Moreover, this court has declined to extend the market share theory of liability to the cases seeking removal of asbestos products from residential housing. (*Mullen* v. *Armstrong World Industries, Inc.* (1988) 200 Cal.App.3d 250, 252, 257 [246 Cal.Rptr. 32].) We reasoned that the prerequisite of fungibility had not been met because asbestos products were not produced from an identical formula and carried more than one risk of harm. (*Id.*, at pp. 256-257.)

selling or distributing goods or products at or from locations outside the United States. . . ." Against this analysis Fibreboard posits that the separate $1 million annual aggregate that it purchased as operations insurance should cover underlying claims alleging concerted action, civil conspiracy, etc.

Not so. ■ First, merely because a word or term is not specially defined does not mean we strictly construe it against the insurer.[5] We do not declare ambiguities by isolating phrases and considering them in the abstract; rather, we construe the provision in the context of the instrument as a whole and in the circumstances of the case. (*Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254 [10 Cal.Rptr.2d 538, 833 P.2d 545]; *Helfand* v. *National Union Fire Ins. Co.*, *supra*, 10 Cal.App.4th at p. 880.) ■ Second, the phrase "foreign based operations" is a limitation on the definition of "policy territory," not on the scope of a substantive type of coverage.

Third, although we agree with Fibreboard that we must read the term "operations" in its "ordinary and popular sense"[6] (Civ. Code, § 1644; *Bank of the West* v. *Superior Court, supra*, 2 Cal.4th at p. 1265), we must also apply this meaning within the context of the function and structure of each policy as a whole. Here, each policy avails a separate $1 million coverage cap for property damage arising out of operations and for bodily injury/ property damages arising out of products. Construing each policy as a whole, we conclude it is unreasonable to align activities concerning failure to warn of product hazards, suppression of product safety information, conspiring to market unsafe products, and the like within the ambit of operations coverage rather than products coverage.

After all, an underlying condition which rendered the products defective and led to the property damage at issue was failure to warn of inherent dangers. Add an extra level of culpability for conspiracy and concerted action to suppress the damning information about the dangers, and you are still squarely within the mode of behavior which caused the product to be

---

[5]*CNA Casualty of California* v. *Seaboard Surety Co.* (1986) 176 Cal.App.3d 598, 613 [222 Cal.Rptr. 276], upon which Fibreboard relies, says as much. However, *Insurance Co. of North America* v. *Sam Harris Constr. Co.* (1978) 22 Cal.3d 409, 412 [149 Cal.Rptr. 292, 583 P.2d 1335], upon which *CNA* in turn relies, does not abrogate the starting point of interpretation, namely, the identification of an ambiguity or uncertainty.

[6]For example, Webster's Encyclopedic Unabridged Dictionary (1989) page 1009 offers these pertinent definitions for "operation": "1. The act or an instance, process, or manner of functioning or operating. . . . 5. A process of a practical or mechanical nature in some form of work or production; . . . 6. A course or procedure of productive or industrial activity. . . ." Fibreboard supplies us with another definition: "[T]he whole process of planning for and operating a business or other organized unit." (Webster's New Internat. Dict. (3d ed. 1965) p. 1581.)

defective in the first place. If the planning and decisions that render the product defective are allocated to operations instead of products liability, then the policy distinction between the two coverages is lost.

The trial court summed it up well when it observed that all management decisions about disclosures, warnings, etc., "are inherent in any product liability case. [¶] You have, first of all, just blameless placing the product on the market. Then you have you should have known but you didn't know that it was going to hurt somebody placing the product on the market, and then you have the you knew darn well and you did it anyway in order to make a buck placing the product on the market. But basically, that's all the same case with the only difference being what the particular state of mind of the manufacturer was. . . . [A]ll . . . would be included under the products hazard [*sic*] definition. The only question is whether or not because some states don't require the plaintiff to point out the defendant's product in court, whether that changes the analysis of this matter." On the basis of this analysis, the court went on to hold that a separate limit under operations would not be available to Fibreboard. We concur.

### (5) *The Conspiracy Allegations Do Not Amount to "Occurrences"*

 Hartford also correctly points out that in any event claims based on conspiracy theories are not covered by Hartford's policies because they do not and cannot allege damage caused by an "occurrence." The Hartford policies provided coverage for bodily injury or property damage "caused by an occurrence." "Occurrence" is defined as "*an accident*, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured." (Italics added.)

A "civil conspiracy" entails formation and operation of the conspiracy and acts done in furtherance of the common design. (*Doctors' Co.* v. *Superior Court, supra*, 49 Cal.3d at p. 44.) In other words, "a person, or defendant, cannot *inadvertently become a member of a civil conspiracy*." (*Rogers* v. *R.J. Reynolds Tobacco Co., supra*, 761 S.W.2d at p. 797.) " ' ". . . [T]here must be a preconceived plan and unity of design and purpose, *for the common design is of the essence of the conspiracy*." ' " (*Id.*, at p. 796, italics in original.) Thus, there is a conscious, decisionmaking element that takes civil conspiracies out of the range of behavior encompassed within the meaning of an "occurrence." An insured who participates in a conspiracy, even if the agreed upon behavior or course of conduct is to act negligently, cannot expect coverage for "an accident." In its plain, ordinary sense, an accident is

"an unforeseen and unplanned event or circumstance." (Webster's New Collegiate Dict. (9th ed. 1984) p. 49.) As a matter of law, a civil conspiracy cannot occur by accident; therefore, the policies afford no coverage for these claims. (See *Chatton v. National Union Fire Ins. Co.* (1992) 10 Cal.App.4th 846, 860-861 [13 Cal.Rptr.2d 318]; *Hurley Construction Co. v. State Farm fire & Casualty Co.* (1992) 10 Cal.App.4th 533, 539 [12 Cal.Rptr.2d 629].)

### C. The Personal Injury Clause Does Not Apply to Any of the Underlying Offenses

■ Fibreboard finally contends that the trial court erred in ruling that the policies did not afford separate coverage under the "personal injury" provisions for causes of action labelled trespass or nuisance. We disagree with Fibreboard.

### (1) Background

■ In the world of liability insurance, personal injury coverage applies to injury which arises out of the commission of certain enumerated acts or offenses. (See 3 Cal. Insurance Law & Practice (1992) § 49.51[1], pp. 49-111-49-112; *Titan Holdings Syndicate v. City of Keene, N.H.* (1st Cir. 1990) 898 F.2d 265, 269 (*Titan* ).) Coverage thus is triggered by the offense, not the injury or damage which a plaintiff suffers.

■ The offenses covered by our policies divide into four groups: libel and slander torts; false arrest, detention and malicious prosecution; nonemployment related discrimination or humiliation; and "wrongful entry or eviction or other invasion of an individual's right of privacy." It is this latter grouping with which we are concerned.

The listed offenses in turn are not separately defined in the policies. We thus give them meaning by reference to their common law elements.

### (2) There Are No Allegations That Can Be Classified as Wrongful Entry or Eviction

Fibreboard first suggests there is coverage for what it calls trespass claims under the specified torts of wrongful entry or eviction. Hartford has provided us with numerous references to state law codifications and variations of a tort of forcible entry or wrongful entry. Common to many is the use or threat of force to dispossess. (See, e.g., Code Civ. Proc., § 1159.) Although wrongful entry can describe a trespass committed for the specific purpose of dispossessing the owner or occupant of land, we agree with Fibreboard that

it can also describe a more general, "simple trespass" involving no intent to dispossess: " 'Every wrongful entry upon land in the occupation or possession of the owner constitutes a trespass . . . .' " (*MacLeod* v. *Fox West Coast T. Corp.* (1937) 10 Cal.2d 383, 387 [74 P.2d 276].)

However, the underlying complaints do not, and cannot, describe an actionable trespass because there is no direct or indirect entry or intrusion by Fibreboard upon the plaintiffs' lands. That the particular manner in which the product becomes a health hazard—namely, contamination through the release and dispersion of microscopic asbestos fibers, filaments and dust throughout the atmosphere of the surrounding properties—is in the nature of an invasion of land does not mean we have a trespass as to defendant manufacturer. At the heart of all the complaints is the allegation that Fibreboard placed defective products into the stream of commerce without alerting the public as to their hazardous nature. Plaintiffs, not knowing the products were hazardous, purchased them and incorporated them into their buildings. The purchase of the products with the resulting transfer of ownership and control to plaintiffs halts the directive flow of the product by defendants and takes these cases out of the trespass paradigm. It is the plaintiffs' property, voluntarily incorporated into the buildings with plaintiffs' permission, that is causing the harm and, thus, there is no third party interference sufficient to sustain trespass liability. Fibreboard may be liable for many wrongs, but they did not commit a trespass by selling a bad product. That the product ends up on a person's land and is intended to be used on the land does not change the picture. All products end up in a physical location that is owned by someone. If they are defective and cause harm, the manufacturer will be liable under a variety of products liability theories but not for a wrongful entry or invasion upon the land.

Fibreboard calls our attention to two cases involving misrepresentations or failure to warn in connection with the sale of products wherein an insured was held to have a duty to defend on the basis of potential personal injury coverage. However these cases found coverage under a variant of our wrongful eviction and entry clause which ended with the catchall phrase "other invasion of the right of private occupancy." (*American States Ins. Co.* v. *Canyon Creek* (N.D.Cal. 1991) 786 F.Supp. 821;[7] *Pipefitters Welfare*

---

[7]In *American States*, the plaintiff homeowners in the underlying action alleged that the insured, engaged in the sale of manufactured housing, falsely represented that the purchasers would have the right to own and occupy the real property on which their mobile homes were located and that the county would approve the housing development as a subdivision. The court held these allegations triggered coverage under the "other invasion of the right of private occupancy" language. This language invokes the duty to defend any action which

*Educ. Fund* v. *Westchester Fire* (7th Cir. 1992) 976 F.2d 1037.[8])

### (3) *The Personal Injury Endorsement Does Not Cover the Nuisance-related Actions*

Fibreboard also contends that the personal injury endorsement covers nuisance actions or, indeed, any alleged interference with the use, enjoyment or occupancy of property. The underlying complaints are replete with such allegations.

Again, cases interpreting the "other invasion of an individual's right of private occupancy" language have so held. (See, e.g., *Titan, supra*, 898 F.2d at p. 273, holding that underlying allegations that noxious odors, noise and light from the city's sewage treatment plant interfered with the homeowner's quiet enjoyment of their property and deprived them of its use were sufficient to come within coverage for liability arising from " 'other invasion of the right of private occupancy.' ") However, Hartford argues persuasively that the catchall term found in our policies, namely, "other invasion of an individual's right of privacy," is aimed at a distinctly different type of tort.

The trial court expressed in colloquy with counsel that the parties must have meant something akin to "right of private occupancy" instead of "right of privacy." It reasoned that since the libel and slander category of offenses ended with the phrase, "a publication or utterance in violation of any individual's right of privacy," the wrongful entry/wrongful eviction category would not be referring to the same kind of privacy interest relating to utterances and publications. Moreover, because the phrase was "tacked on" to the wrongful entry or eviction block of offenses, it was more in the nature of the right of private occupancy.

However, the right of privacy has been described as the right "to be let alone," which can be tortiously invaded in diverse ways and in diverse contexts. (Rest.2d Torts, § 652A, com. a, at p. 376; *Miller* v. *National Broadcasting Co.* (1986) 187 Cal.App.3d 1463, 1481-1482 [232 Cal.Rptr.

---

potentially constitutes " 'an invasion of the right of private occupancy which incurs tort liability as opposed to contract liability.' " (*Id.*, at p. 828, quoting *Fragomeno* v. *Insurance Co. of the West* (1989) 207 Cal.App.3d 822, 828 [255 Cal.Rptr. 111].)

[8]The court in *Pipefitters* found a duty to defend a suit on allegations that the seller of a used transformer failed to warn the purchasing scrap metal company that the transformer contained polychlorinated biphenyl (PCB). Upon preparing the transformer for scrap, PCB-laced oil contaminated the property, leading to imposition of a seal order and an environmental reclamation lien. Finding coverage within the "other invasion of the right to private occupancy" prong of the personal injury definition, the court concluded a reasonable policyholder would see the alleged negligence as impairing the plaintiff's right to occupy its property. (976 F.2d at pp. 1040-1042.)

668, 69 A.L.R.4th 1027].) At common law the invasion of the right of privacy has clustered into four distinct wrongs, "whose only relation to one another is that each involves interference with the interest of the individual in leading, to some reasonable extent, a secluded and private life, free from the prying eyes, ears and publications of others." (Rest.2d Torts, § 652A, com. b, at p. 377.) The four forms of tortious invasion are: unreasonable intrusion upon the seclusion of another; appropriation of the other's name or likeness; unreasonable publicity given to the other's private life; and publicity that unreasonably places the other in a false light before the public. (*Id.*, § 652A, at p. 376; Prosser & Keeton on Torts (5th ed. 1984) § 117, pp. 851-868.)

The first category of privacy rights protects an individual's right to be secure from intrusion. The Restatement defines the offensive conduct this way: "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." (Rest.2d Torts, § 652B, at p. 378.) In *Miller* the reviewing court concluded that the plaintiff stated a cause of action for invasion of privacy by intrusion based on a television crew's entry into her home, without consent, at a time of confusion and vulnerability occasioned by her husband's heart seizure. (*Miller* v. *National Broadcasting Co.*, *supra*, 187 Cal.App.3d at p. 1484.)

As the Restatement further explains, this form of invasion of privacy "may be by physical intrusion into a place in which the plaintiff has secluded himself, as when the defendant forces his way into the plaintiff's room in a hotel or insists over the plaintiff's objection in entering his home. It may also be by the use of the defendant's senses, with or without mechanical aids, to oversee or overhear the plaintiff's private affairs, as by looking into his upstairs windows with binoculars or tapping his telephone wires. It may be by some other form of investigation or examination into his private concerns, as by opening his private and personal mail, searching his safe or his wallet, examining his private bank account . . . ." (Rest.2d Torts, § 652B, com. b, at pp. 378-379.)

Fibreboard's entire argument for finding coverage for claims of nuisance and other allegations of interference with real property rights stems from its analysis of cases which have interpreted and applied the "other invasion of the private right of occupancy" variant of personal injury coverage. For example, in California the listing "wrongful entry, eviction and invasions of the right of private occupancy" has been held to pertain to torts against real

property as a matter of law. (*Waranch v. Gulf Insurance Co.* (1990) 218 Cal.App.3d 356, 361 [266 Cal.Rptr. 827].) However, the *Waranch* court also made it clear that the key term " ' "[o]ccupancy" ordinarily refers to "the taking and holding possession of real property under a lease or tenancy at will." [Citation.] The association of "occupancy" with real property . . . is reinforced by its conjunction with the words "wrongful entry or eviction." "Eviction" is a term almost exclusively associated with real property. . . .' " (*Id.*, at p. 359, quoting *Nichols v. Great American Ins. Companies* (1985) 169 Cal.App.3d 766, 775-776 [215 Cal.Rptr. 416]; see also *Fragomeno v. Insurance Co. of the West, supra,* 207 Cal.App.3d 822, 828.)

The dynamic changes when the key term is "privacy" rather than "occupancy." "Privacy" as a protected interest has its own meaning, separate from the interest of occupancy. Occupancy goes to the holding, possessing or residing in or on something; privacy goes to the individual's interest in being "left alone." The scope of privacy interest as well as tortious invasions thereof are well defined in the treatises and cases. Reading the term "other invasion of an individual's right of privacy," in conjunction with the offenses of wrongful entry and eviction, it is clear that the common thread is concern with aggressive or unwarranted intrusions or ousters. These may occur with respect to a person's land, home, or other quarters or physical space, or with respect to a person's private affairs or concerns. An intrusion upon the seclusion of another could well be accomplished by a trespass, wrongful entry or wrongful eviction.

As we have explained, personal injury coverage focuses on the nature of the specified tort that causes the damage. To the extent the listed offenses are framed in generic terms, they should be construed broadly to encompass all specific torts which reasonably could fall within the general category. However, Fibreboard has not identified any tort alleged against it which would fall within the ambit of the invasion of privacy torts.

The nuisance and other allegations going to interference with the plaintiffs' real property rights all have their roots in offending conduct which lies outside the scope of the personal injury coverage afforded by the policies in question. In other words, the offending behavior which created the public health hazard (public nuisance allegations) or interfered with plaintiffs' use and enjoyment of their property (private nuisance claims) invariably constituted the litany of products-based torts already described—negligent failure to warn; conspiracy to suppress damaging information about products; concert of action in marketing hazardous products; etc. The essence of the nuisance-related actions is that the sum of the defendant-manufacturers'

tortious behavior created public and private nuisances on plaintiffs' property. But the underlying discrete offenses are not among the enumerated torts coming within the definition of personal injury and, in particular, they do not constitute wrongful evictions, wrongful entries or invasions of privacy.

Finally, we concur with Hartford that the plaintiffs in the underlying cases have no protectable privacy interest because they are corporations, partnerships[9] and public entities, not natural persons.[10] "The right protected by the action for invasion of privacy is a personal right, peculiar to the individual whose privacy is invaded." (Rest.2d Torts, § 652I, com. a, at p. 403.) "A corporation, partnership or unincorporated association has no personal right of privacy." (*Id.*, com. c, at p. 403.) Therefore, as a matter of law the plaintiffs pursuing the underlying claims cannot state a cause of action for invasion of privacy. (*N.O.C., Inc.* v. *Schaefer* (1984) 197 N.J.Super. 249 [484 A.2d 729, 730-731].)

For all these reasons we conclude the trial court correctly determined that the personal injury coverage has no application for the underlying claims because they do not allege an offense within the scope of that coverage.

The judgment is affirmed.[11]

Poché, J., and Perley, J., concurred.

---

[9]One plaintiff, a limited partnership, is pursuing the complaint as a class action. However, the complaint only identifies the following discrete torts: negligence, strict liability, breach of warranties, fraud and misrepresentation, concert of action, civil conspiracy, intentional infliction of injury (punitive damages) and breach of postmanufacture/sale duty.

[10]Fibreboard points out that the limits of liability provisions explicitly list organizations and persons as the targets for sustaining personal injury damages covered under the policies. Indeed, some of the specific offenses listed under the personal injury clause would apply to corporations (e.g., defamation). However, that does not mean that all of the listed offenses, as a matter of tort law, apply to organizations! Moreover, the fact that some of the complaints refer to privacy invasions of natural persons does not elevate the corporate plaintiff's cause of action to one of invasion of privacy.

[11]We deny Hartford's motion to strike a portion of Fibreboard's reply brief. The objected to portion refers to matters which the trial court excluded from evidence. We treat Fibreboard's reference to these matters as an objection to the trial court's ruling and reaffirm that the matters are impermissible hearsay and irrelevant.