Filed 11/06/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE TRAVELER'S PROPERTY CASUALTY COMPANY OF AMERICA et al., | G053749 |
| Plaintiffs and Respondents, | (Super. Ct. No. 30-2014-00746842) |
| v. | O P I N I O N |
| ACTAVIS, INC., et al., | |
| Defendants and Appellants. | |

Appeal from a judgment of the Superior Court of Orange County, William D. Claster, Judge. Affirmed.

Blank Rome, Elizabeth B. Kim and James R. Murray for Defendants and Appellants.

Dentons US, Ronald D. Kent, Joshua Kroot; Choate Hall & Stewart, Robert A. Kole and Jean-Paul Jaillet for Plaintiffs and Respondents.

\*          \*          \*

**INTRODUCTION**

The United States faces an epidemic of addiction, overdosing, death, and other problems brought on by the increasing use and abuse of opioid painkillers. This epidemic has placed a financial strain on state and local governments dealing with the epidemic's health and safety consequences. To seek redress for the opioid epidemic, the County of Santa Clara and the County of Orange brought a lawsuit (the California Action) against various pharmaceutical manufacturers and distributors, including the appellants in this matter.[1] The California Action alleges Watson engaged in a "common, sophisticated, and highly deceptive marketing campaign" designed to expand the market and increase sales of opioid products by promoting them for treating long-term chronic, nonacute, and noncancer pain—a purpose for which Watson allegedly knew its opioid products were not suited. The City of Chicago brought a lawsuit in Illinois (the Chicago Action) making essentially the same allegations.

The issue presented by this appeal is whether there is insurance coverage for Watson based on the allegations made in the California Action and the Chicago Action. Specifically, do the Travelers Property Casualty Company of America (Travelers Insurance) and St. Paul Fire and Marine Insurance Company (St. Paul)[2] owe Watson a duty to defend those lawsuits pursuant to commercial general liability (CGL) insurance policies issued to Watson?

Travelers denied Watson's demand for a defense and brought this lawsuit to obtain a declaration that Travelers had no duty to defend or indemnify. The trial court, following a bench trial based on stipulated facts, found that Travelers had no duty to

---

[1] Appellants are Actavis, Inc., Actavis LLC, Actavis Pharma, Inc., Watson Pharmaceuticals, Inc., Watson Laboratories, Inc., and Watson Pharma, Inc. The parties refer to the appellants collectively as Watson, and, for the sake of consistency, we shall do the same.

[2] We refer to Travelers Insurance and St. Paul together as "Travelers."

2

defend because the injuries alleged were not the result of an accident within the meaning of the insurance policies and the claims alleged fell within a policy exclusion for the insured's products and for warranties and representations made about those products.

We conclude that Travelers has no duty to defend Watson under the policies and therefore affirm. The policies cover damages for bodily injury caused by an "accident," a term which has been interpreted to exclude the insured's deliberate acts unless the injury was caused by some additional, unexpected, independent, and unforeseen happening. The California Action and the Chicago Action do not create a potential for liability for an accident because they are based, and can only be read as being based, on the deliberate and intentional conduct of Watson that produced injuries— including a resurgence in heroin use—that were neither unexpected nor unforeseen. In addition, all of the injuries allegedly arose out of Watson's products or the alleged statements and misrepresentations made about those products, and therefore fall within the products exclusions in the policies.

## FACTS

### I.

### The Policies

A. *The St. Paul Policies*

Watson purchased primary CGL policies from St. Paul covering the period from May 15, 2006 to May 15, 2010 (the St. Paul Policies). The St. Paul Policies provide a duty to defend against any "suit for injury or damage covered by this agreement . . . even if all of the allegations of the claim or suit are groundless, false, or fraudulent." The St. Paul Policies cover "damages for covered bodily injury or property damage" that are "caused by an event." The term "Event" is defined as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions." The term

3

"bodily injury" is defined as "any physical harm, including sickness or disease, to the physical health of other persons."

The St. Paul Policies have an exclusion for "Products and Completed Work," stating, "[w]e won't cover bodily injury or property damage that results from your products or completed work." The St. Paul Policies include, within the definition of excluded products, "any statement made, or that should have been made, about the durability, fitness, handling, maintenance, operation, performance, quality, safety or use of the products."

B. *The Travelers Policies*

Watson purchased primary CGL policies from Travelers Insurance covering the period from May 15, 2010 to May 15, 2013 (the Travelers Policies). The Travelers Policies provide a duty to defend against any "suit" seeking damages "because of 'bodily injury' or 'property damage'" caused by an "occurrence." The Travelers Policies define "occurrence" in the same way as "event" is defined in the St. Paul Policies, that is, as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions." The Travelers Policies define "bodily injury" as "[p]hysical harm, including sickness or disease, sustained by a person; or . . . [m]ental anguish, injury or illness, or emotional distress, resulting at any time from such physical harm, sickness or disease." The Travelers Policies provide that "damages because of 'bodily injury' include damages claimed by any person or organization for care, loss of services or death resulting at any time from 'bodily injury.'"

The Travelers Policies have an exclusion for "Products-Completed Operations Hazard-Medical and Biotechnology," which bars coverage for "'Bodily injury' or 'Property damage' included in the 'products-completed operations hazard.'" We will refer to the Products and Completed Work provision of the St. Paul Policies and the Products-Completed Operations Hazard-Medical and Biotechnology provision of the Travelers Policies as "the Products Exclusions." The term "products-completed

4

operations hazard" is defined to include "all 'bodily injury' and 'property damage' occurring away from premises owned by or rented or loaned to you and arising out of 'your product' or 'your work.'"  The term "your product" is defined as "[a]ny goods or products . . . manufactured, sold, handled, distributed or disposed of by:  [¶] . . . [y]ou."  The term "your work" is defined to mean:  "Warranties or representations made at any time, or that should have been made, with respect to the fitness, quality, durability, performance, handling, maintenance, operation, safety, or use of such goods or products."

**II.**

**The California Action and the Chicago Action**

In May 2014, Santa Clara County and Orange County (the Counties) filed the California Action against Watson[3] and other pharmaceutical companies in the California Superior Court, Orange County.  In December 2014, the Counties filed a second amended complaint (the California Complaint), which is the operative pleading in the California Action.  In June 2014, the City of Chicago (the City) brought the Chicago Action against Watson and other prescription drug distributors in Cook County, Illinois.  The Chicago Action was removed to federal court.  In August 2015, the City filed a second amended complaint (the Chicago Complaint), which is the operative pleading in the Chicago Action.

---

[3] The relationship among the Watson entities is alleged as:  "Actavis PLC is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland.  Watson Pharmaceuticals, Inc. acquired Actavis, Inc. in October 2012 and the combined company name was changed to Actavis, Inc. as of January 2013.  The combined company then became a wholly[-]owned subsidiary [of] Actavis PLC in October 2013.  Watson Laboratories, Inc. is a Nevada corporation with its principal place of business in . . . California, and is a wholly[-]owned subsidiary of Actavis, Inc. . . . a Nevada Corporation with its principal place of business in . . . New Jersey.  Actavis Pharma, Inc. is a Delaware corporation with its principal place of business in New Jersey, and was formerly known as Watson Pharma, Inc.  Actavis LLC is a Delaware limited liability company with its principal place of business in . . . New Jersey.  Each of these defendants is owned by Actavis [PLC], which uses them to market and sell its drugs in the United States."  (Some capitalization omitted.)

5

The California Complaint and the Chicago Complaint are based on allegations that Watson and the other defendants engaged in a fraudulent scheme to promote the use of opioids for long-term pain in order to increase corporate profits. Both complaints allege that Watson had by the 1990's developed the ability to cheaply produce opioid painkillers, but the market for them was small. Defendants knew that opioids were an effective treatment for short-term postsurgical pain, trauma-related pain, and end-of-life care and knew that, except as a last resort, "opioids were too addictive and too debilitating for long-term use for chronic non-cancer pain." Defendants knew the effectiveness of opioids decreases with prolonged use, requiring increases in dosages and "markedly increasing the risk of significant side effects and addiction."

The California Complaint and the Chicago Complaint allege: "In order to expand the market for opioids and realize blockbuster profits, Defendants needed to create a sea-change in medical and public perception that would permit the use of opioids for long periods of time to treat more common aches and pains, like lower back pain, arthritis, and headaches. [¶] . . . Defendants, through a common, sophisticated, and highly deceptive marketing campaign that began in the late 1990s, deepened around 2006, and continues to the present, set out to, and did, reverse the popular and medical understanding of opioids." Defendants are alleged to have spent millions of dollars developing seemingly scientific materials, studies, and guidelines that misrepresented the risks, benefits, and superiority of opioids to treat chronic pain and distributed those materials, studies, and guidelines to physicians to encourage them to prescribe opioids to treat chronic, noncancer pain.

To increase prescription sales of their opioid drugs, Watson and the other defendants allegedly "(a) overstated the benefits of chronic opioid therapy, promised improvement in patients' function and quality of life, and failed to disclose the lack of evidence supporting long-term use and the significant risks associated with such use; (b) trivialized or obscured their serious risks and adverse outcomes, including the risk of

6

addiction, overdose, and death; and (c) overstated their superiority compared with other treatments, such as other non-opioid analgesics, physical therapy, and other alternatives."

Central to the scheme were representations made by Watson that opioids are rarely addictive. Watson allegedly "persuaded doctors and patients that what they had long known—that opioids are addictive drugs, unsafe in most circumstances for long-term use—was untrue, and quite the opposite, that the compassionate treatment of pain required opioids."

The California Complaint alleges that Watson and the other defendants "took steps to avoid detection of and fraudulently conceal their deceptive marketing and conspiratorial behavior" and "made, promoted, and profited from their misrepresentations—individually and collectively—knowing that their statements regarding the risks, benefits and superiority of opioids for chronic pain were untrue and unproven." Both the California Complaint and the Chicago Complaint allege that Watson's strategy was "first, to plant and promote supportive literature while burying unfavorable evidence, and then to cite that same pro-opioid evidence in their promotional materials, while failing to disclose evidence that contradicts those claims—are flatly inconsistent with their legal obligations." Those strategies were intended to, and did, "distort the truth regarding the risks and benefits of opioids for chronic pain relief and distorted prescribing patterns as a result." Watson and the other defendants knew and intended that their representations "would persuade doctors to prescribe and patients to use opioids for chronic pain."

The California Complaint and the Chicago Complaint allege the efforts of Watson and the other defendants were "wildly successful" so that "[t]he United States is now awash in opioids." The result, the complaints allege, has been "catastrophic" and a nationwide "opioid-induced 'public health epidemic.'" In addition, the complaints allege the epidemic of opioid use has led to a resurgence in heroin use. The "dark side of opioid

7

abuse and addiction" is that it can lead to abuse of and addiction to heroin, which produces a "high" similar to opioids but at a lower cost.

The California Complaint and the Chicago Complaint allege that the Counties and the City have and will incur increased costs of care and services to their citizens injured by prescription and illegal opioid abuse and addiction. The California Complaint alleges: "The diversion of opioids into the secondary, criminal market and the increase in the number of individuals who abuse or are addicted to opioids have increased the demands on emergency services and law enforcement in California; [¶] . . . [¶] These harms have taxed the human, medical, public health, law enforcement, and financial resources of the People."

The Chicago Complaint alleges: "The City's health plans have also paid costs imposed by long-term opioid use, abuse, and addiction, such as hospitalizations for opioid overdoses, drug treatment for individuals addicted to opioids, intensive care for infants born addicted to opioids, long-term disability, and more. The City's workers' compensation program and health benefit plans have expended approximately $2.4 million on addiction treatment services from May 2013 to May 2015. . . . [¶] . . . Defendants' conduct has also imposed costs on the City beyond those incurred by its health and workers compensation plans. These include costs of providing emergency services in response to opioid-related deaths, overdoses, addiction, and other injury; costs of funding addiction treatment, such as the prescription of additional drugs . . . and other costs attendant to the epidemic of opioid use and abuse in the City."

The California Complaint asserts three causes of action: (1) false advertising in violation of Business and Professions Code section 17500 et seq.; (2) unfair competition in violation of Business and Professions Code section 17200; and (3) public nuisance under Civil Code section 3479 et seq. Under the first cause of action, the Counties seek injunctive relief, restitution, and civil penalties. Under the second cause of action, the Counties seek civil penalties, and under the third cause of action seek

8

an order of abatement and injunctive relief. Watson does not seek coverage based on the first two causes of action.

The Chicago Complaint asserts 10 counts: (I) Consumer Fraud—Deceptive Practices; (II) Consumer Fraud—Unfair Practices; (III) Misrepresentations in Connection with Sale or Advertisement of Merchandise; (IV) False Statements to the City; (V) False Claims; (VI) Conspiring to Defraud By Getting False or Fraudulent Claims Paid or Approved by the City; (VII) Recovery of City Costs of Providing Services; (VIII) Insurance Fraud; (IX) Civil Conspiracy; and, (X) Unjust Enrichment. Of these, counts I, II, III, IV, V, VII, VIII, and X are asserted against Watson. Against Watson, the Chicago Complaint seeks injunctive relief, restitution, treble restitution, civil penalties, disgorgement of profits based on unjust enrichment, treble damages, and costs incurred by the City of Chicago that were related to the violations of state, federal, and local law.

## III.

### The Coverage Lawsuit

In June 2014, Watson tendered the California Action and the Chicago Action to Travelers. In September and December 2014, Travelers denied it had a duty to defend Watson in connection with either action.

In September 2014, Travelers filed this lawsuit to obtain a declaration it had no obligation under the St. Paul Polices or the Travelers Policies to defend or indemnify Watson in connection with the California Action or the Chicago Action. Travelers filed an amended complaint in December 2014. Watson answered and filed a cross-complaint for declaratory relief, breach of contract, and breach of the implied covenant of good faith and fair dealing. Travelers and Watson stipulated to a stay of all claims other than their respective declaratory relief claims on the duty to defend and agreed to proceed with a trial on a statement of stipulated facts.

A trial on stipulated facts was held in March 2016. The trial court issued a proposed statement of decision finding that Travelers had no duty under the Policies to

9

defend Watson.  The court concluded (1) the California Complaint and the Chicago Complaint do not alleged an "accident" as required by the definition of "occurrence" (Travelers Policies) or "event" (St. Paul Policies) to create a duty to defend[4] and (2) the Products Exclusions precluded coverage for Watson's claims.[5]  The court deemed moot the issue whether the California Action or the Chicago Action "seek damages for" or "because of" potentially covered "bodily injury."

The proposed statement of decision became the final statement of decision without objections or proposed additions.  Travelers and Watson stipulated to a judgment in favor of Travelers on claims not resolved by the statement of decision, including the claim by Travelers it had no duty to indemnify Watson.  Judgment was entered in favor of Travelers and against Watson on all causes of action of the Travelers' complaint and Watson's cross-complaint.  Watson timely filed a notice of appeal.

---

[4] The trial court concluded:  "In the case at hand, the theory of both the California and the Chicago lawsuits is that Watson engaged in a well-orchestrated scheme to increase the use and sales of its opioids notwithstanding their known but undisclosed addictiveness.  Both lawsuits emphasize the deliberate nature of Watson's actions.  Watson is accused of a course of conduct designed to increase sales of its opioids by intentionally misleading doctors and the public.  It is further accused of fraudulently concealing its deceptive marketing practices. Under *Delgado* [*v. Interinsurance Exchange of Automobile Club of Southern California* (2009) 47 Cal.4th 302] and its progeny, the fact that Watson's allegedly intentional misconduct may have resulted in unintended consequences such as an increase in heroin addiction does not transform the purported misconduct into an 'accident' as that term is used in the two insurance policies."

[5] The trial court concluded:  "All of the harm that is asserted in the lawsuits—narcotics addiction, the public nuisance in the California action and the public health costs, etc. highlighted in the Chicago [Action]—stem from Watson's products and what Watson said and did not say about the products.  Put another way, to the extent that any 'bodily damage' occurred, it directly arose from Watson's products.  Significantly, both the St. Paul and Travelers Property Products Exclusion provisions encompass statements/representations that were made or that should have been [made] regarding Watson's products.  Such statements/misrepresentations are at the heart of the two lawsuits—indeed, without the alleged scheme to inflate the sales of the opioids, there would be no basis for the legal actions."

10

## DISCUSSION

## I.

### An Insurer's Duty to Defend:  General Principles and Standard of Review

The insurer's duty to defend is broader than the duty to indemnify. (*Hartford Casualty Inc. Co. v. Swift Distributors, Inc.* (2014) 59 Cal.4th 277, 287 (*Swift*); *Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 299 (*Montrose*).)  An insurer owes the insured a duty to defend against claims that create "a potential for indemnity under the insurance policy," and that duty arises even if the evidence suggests, without conclusively establishing, that the loss is not covered.  (*Swift, supra*, at p. 287; *Montrose, supra*, at p. 299.)

Determination of the duty to defend is made in the first instance by comparing the allegations of the complaint and the terms of the insurance policy.  (*Swift, supra*, 59 Cal.4th at p. 287.)  The duty to defend also may exist when facts extrinsic to the complaint and known to the insurer suggest the claim might be covered.  (*Ibid*.) "'Moreover, that the precise causes of action pled by the third party complaint may fall outside policy coverage does not excuse the duty to defend where, under the facts alleged, reasonably inferable, or otherwise known, the complaint could fairly be amended to state a covered liability.'  [Citation.]  Thus, '[i]f any facts stated or fairly inferable in the complaint, or otherwise known or discovered by the insurer, suggest a claim potentially covered by the policy, the insurer's duty to defend arises and is not extinguished until the insurer negates all facts suggesting potential coverage.'"  (*Ibid.*) Doubt about an insurer's duty to defend generally must be resolved in the insured's favor. (*Ibid.*)

The duty to defend, though broad, is measured by the nature and kinds of risk insured by the policy. (*Swift, supra*, 59 Cal.4th at p. 288.)  "In an action seeking declaratory relief concerning a duty to defend, 'the insured must prove the existence of a

*potential for coverage*, while the insurer must establish *the absence of any such potential*. In other words, the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot*.' [Citation.] Thus, an insurer may be excused from a duty to defend only when '"the third party complaint can by no conceivable theory raise a single issue which could bring it within the policy coverage."' [Citation.] In a 'mixed' action, where some claims are potentially covered while others are not, 'the insurer has a duty to defend as to the claims that are at least potentially covered.'" (*Ibid.*)

When the facts are undisputed or stipulated, the meaning and interpretation of an insurance policy are reviewed de novo under rules of contract interpretation. (*Adamo v. Fire Ins. Exchange* (2013) 219 Cal.App.4th 1286, 1293.) "'The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the "mutual intention" of the parties. "Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. (Civ. Code, § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. (*Id.*, § 1639.) The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' (*id.*, § 1644), controls judicial interpretation. (*Id.*, § 1638.)"'" (*E.M.M.I. Inc. v. Zurich American Ins. Co.* (2004) 32 Cal.4th 465, 470.)

**II.**

**There Is No Potential for Coverage Because the Claims Arise Only Out of Watson's Deliberate Conduct.**

A. *"Accident" and "Deliberate" Acts:  Background*

In deciding whether Travelers had a duty to defend Watson, we compare the allegations of the complaint and the terms of the insurance policies. (*Swift, supra*, 59 Cal.4th at p. 287.) The St. Paul Policies provide coverage for an "event," and the

12

Travelers Policies provide coverage for an "occurrence," each defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

"In the context of liability insurance, an accident is '"an unexpected, unforeseen, or undesigned happening or consequence from either a known or an unknown cause."' [Citations.] 'This common law construction of the term "accident" becomes part of the policy and precludes any assertion that the term is ambiguous.'" (*Delgado v. Interinsurance Exchange of Automobile Club of Southern California, supra*, 47 Cal.4th at p. 308 (*Delgado*).) "Under California law, the word 'accident' in the coverage clause of a liability policy refers to the conduct of the insured for which liability is sought to be imposed on the insured." (*Id.* at p. 311.) "The term 'accident' in the policy's coverage clause refers to the injury-producing acts of the insured, not those of the injured party." (*Id.* at p. 315.)

"'An accident does not occur when the insured performs a deliberate act unless some additional, unexpected, independent, and unforeseen happening occurs that produces the damage.' [Citations.] An accident may exist if '"any aspect in the causal series of events leading to the injury or damage was unintended by the insured and a matter of fortuity."' [Citation.] However, '[w]here the insured intended all of the acts that resulted in the victim's injury, the event may not be deemed an "accident" merely because the insured did not intend to cause injury.'" (*Navigators Specialty Ins. Co. v. Moorefield Construction, Inc.* (2016) 6 Cal.App.5th 1258, 1275 (*Navigators*).)

In *Navigators*, the insured, a general contractor, made the deliberate decision to have flooring tiles installed in a building despite knowing that the concrete slab on which the tiles were to be installed emitted moisture vapor in excess of specifications. (*Navigators, supra*, 6 Cal.App.5th at pp. 1262, 1266-1268.) The insured knew the excess moisture vapor could cause the flooring tiles to fail, but believed there was low to no risk of that happening. (*Id.* at p. 1267.) The flooring tiles failed and repair

13

costs were \$377,404. (*Id.* at pp. 1262, 1268-1269.) The insurer provided the insured a defense in the underlying litigation under a reservation of rights, paid the policy limits in settlement, and, after learning the insured had made the order to install the flooring tiles on a moist concrete slab, brought a lawsuit seeking a declaration it had no duty to defend or indemnify the insured. (*Id.* at pp. 1272-1273.)

The trial court concluded the insurer had no duty to indemnify the insured, and a panel of this court affirmed. (*Navigators, supra*, 6 Cal.App.5th at pp. 1262-1263.) The insured acted deliberately in directing the installation of the flooring tiles and knew the moisture vapor emission rate from the concrete slab exceeded specifications. (*Id.* at p. 1276.) The excess moisture caused the tiles to fail and there was no "'additional, unexpected, independent, and unforeseen happening'" that produced the damage. (*Ibid.*) The insured's mistaken belief that there was little to no risk in installing the flooring tiles did not transform the insured's deliberate act into an accident. (*Id.* at p. 1277.) We did conclude, however, the insurer had a duty to defend because the complaint in the underlying action alleged facts that created the potential for coverage; i.e., that the flooring tiles failed for reasons other than excess moisture vapor emitted from the concrete slab. (*Id.* at p. 1285.)

In *State Farm General Ins. Co. v. Frake* (2011) 197 Cal.App.4th 568 (*Frake*), the insured struck his friend, John King, in the groin while the two were engaged in horseplay. (*Id.* at p. 571.) King sustained injuries and sued the insured, who tendered his defense to the insurer under a liability provision of a renter's policy. (*Ibid.*) The insurer sued the insured for a declaration regarding the duty to defend. (*Ibid.*) The Court of Appeal, reversing the trial court, held the insurer had no duty to defend because the insured engaged in an intentional act. (*Id.* at pp. 582-583.) The Court of Appeal confirmed that under *Delgado, supra*, 47 Cal.4th 302, "the term 'accident' does not apply where an intentional act resulted in unintended harm." (*Frake, supra*, at p. 582.)

14

In *Fire Ins. Exchange v. Superior Court* (2010) 181 Cal.App.4th 388, 396 (*Fire Ins. Exchange*), the insureds intentionally constructed a home that extended across the property line under the mistaken belief they owned a five-and-one-half-foot strip of land and had the legal right to build on it. Faced with a lawsuit for quiet title, declaratory relief, and fraud, the insureds tendered defense to their insurer under a homeowners policy. (*Id.* at p. 391.) After the insurer refused to defend on the ground there was no potential for coverage, the insureds sued for breach of contract and bad faith. (*Ibid.*) The trial court denied the insurer's motion for summary judgment. (*Ibid.*)

The Court of Appeal held that the trial court erred and directed it to grant the insurer's motion for summary judgment. (*Fire Ins. Exchange, supra*, 181 Cal.App.4th at p. 390.) The Court of Appeal concluded the act of constructing the home was intentional and, therefore, not an accident under the policy, even though the insureds acted under a mistaken belief they had the right to do so. (*Id.* at p. 396.) No unexpected and unintended event occurred between the time of the intentional construction and the time of the encroachment on the neighbor's property. (*Ibid.*) Although the insureds believed they had the legal right to take the action they did, their "mistaken belief in their legal right to build does not transform their intentional act of construction into an accident." (*Ibid.*)

B. *The California Complaint and the Chicago Complaint Do Not Allege the Potentiality of Liability Based on an Accident.*

The claims of the California Complaint and the Chicago Complaint are based on allegations that Watson engaged in deliberate conduct. The allegations that Watson and the other defendants engaged in "a common, sophisticated, and highly deceptive marketing campaign" aimed at increasing sales of opioids and enhancing corporate profits can only describe deliberate, intentional acts. Claims involving intentional or negligent misrepresentations do not constitute an accident under a liability policy. (*Miller v. Western General Agency, Inc.* (1996) 41 Cal.App.4th 1144, 1150 [no

15

duty to defend claims for fraud, deceit, and negligent misrepresentation in connection with the advertising and sale of a home because the underlying claims did not allege an accident]; *Dykstra v. Foremost Ins. Co.* (1993) 14 Cal.App.4th 361, 367 [no duty to defend because "coverage was provided for accidents only and not for intentional or negligent misrepresentations"]; *Genesis Ins. Co. v. BRE Props.* (N.D. Cal. 2013) 916 F.Supp.2d 1058, 1073 [no duty to defend because a "misrepresentation is not an accident, and so it does not fall within the policy's definition of an occurrence"].)

Because the California Complaint and the Chicago Complaint allege that Watson engaged in deliberate conduct, there could be no insurable "accident" under the policies unless "'some additional, unexpected, independent, and unforeseen happening'" produced the injuries for which the complaints seek a remedy. (*Navigators, supra*, 6 Cal.App.5th at p. 1275.) Were the injuries alleged, as Watson asserts, "indirect unintended results" caused by "mere negligence or fortuities outside Watson's control"? Or were the injuries alleged, as Travelers asserts, the direct result of "the flood of opioids that entered the market" resulting from Watson's alleged scheme to increase the sale of opioid products?

In resolving this question, we emphasize that whether Watson intended to cause injury or mistakenly believed its deliberate conduct would not or could not produce injury is irrelevant to determining whether an insurable accident occurred. (*Navigators, supra*, 6 Cal.App.5th at pp. 1275, 1277; see *Albert v. Mid-Century Ins. Co.* (2015) 236 Cal.App.4th 1281, 1291 ["When an insured intends the acts resulting in the injury or damage, it is not an accident 'merely because the insured did not intend to cause injury'"].) Instead, we look to whether the California Complaint and the Chicago Complaint allege, directly or by inference, it was Watson's deliberate conduct, or an additional, unexpected, independent, and unforeseen happening, that produced the alleged injuries.

16

The injuries alleged by the California Complaint and the Chicago Complaint are: (1) a nation "awash in opioids"; (2) a nationwide "opioid-induced 'public health epidemic'"; (3) a resurgence in heroin use; and (4) increased public health care costs imposed by long-term opioid use, abuse, and addiction, such as hospitalizations for opioid overdoses, drug treatment for individuals addicted to opioids and intensive care for infants born addicted to opioids.

None of those injuries was additional, unexpected, independent, or unforeseen. The complaints allege Watson knew that opioids were unsuited to treatment of chronic long-term, nonacute pain and knew that opioids were highly addictive and subject to abuse, yet engaged in a scheme of deception in order to increase sales of their opioid products. It is not unexpected or unforeseen that a massive marketing campaign to promote the use of opioids for purposes for which they are not suited would lead to a nation "awash in opioids." It is not unexpected or unforeseen that this marketing campaign would lead to increased opioid addiction and overdoses. Watson allegedly knew that opioids were highly addictive and prone to overdose, but trivialized or obscured those risks.

It also is not unexpected or unforeseen that promoting the use of opioids would lead to a resurgence in heroin use. The California Complaint alleged: "The pain-relieving properties of opium have been recognized for millennia. So has the magnitude of its potential abuse and addiction. Opioids, after all, are closely related to illegal drugs like opium and heroin." Both the California Complaint and the Chicago Complaint allege: "Defendants had access to scientific studies, detailed prescription data, and reports of adverse events, including reports of addiction, hospitalization, and deaths—all of which made clear the significant adverse outcomes from opioids and that patients were suffering from addiction, overdoses, and death in alarming numbers."

Watson argues the alleged injuries are not the "normal consequences of the acts alleged" and, for its opioid products to end up in the hands of abusers, it was

17

necessary for doctors to prescribe the drugs to abusers. The test, however, is not whether the consequences are normal; the test is whether an additional, unexpected, independent, and unforeseen happening produced the consequences. The role of doctors in prescribing, or misprescribing, opioids is not an independent or unforeseen happening. The California Complaint and the Chicago Complaint allege: "Nor is Defendants' causal role broken by the involvement of doctors, professionals with the training and responsibility to make individualized medical judgments for their patients. Defendants' marketing efforts were ubiquitous and highly persuasive. Their deceptive messages tainted virtually every source doctors could rely on for information and prevented them from making informed treatment decisions."

C. *Coverage Decisions Arising from West Virginia Litigation*

Pharmaceutical companies, including Watson, also are the target of litigation in West Virginia for their alleged role in the opioid crisis. In two decisions, *Liberty Mut. Fire Ins. Co. v. JM Smith Corp.* (4th Cir. 2015) 602 Fed.Appx. 115 (*JM Smith*) and *Cincinnati Ins. Co. v. Richie Enterprises, LLC* (W.D. Ky. 2014, Civ. A. No. 1:12-CV-00186-JHM-HBB) 2014 U.S.Dist Lexis 27306 (*Richie*), courts have concluded the insurer had a duty to defend the pharmaceutical companies in the West Virginia lawsuit. Watson argues those decisions support imposing on Travelers a duty to defend Watson in the California Action and the Chicago Action. The allegations in the West Virginia lawsuit are, however, appreciably different from those in the California Complaint and the Chicago Complaint, and the state law governing those decisions is different from California law.

*JM Smith* and *Richie* both arose out of the same complaint brought by the State of West Virginia against 13 pharmaceutical drug distributors. (*JM Smith, supra*, 602 Fed.Appx. at p. 117; *Richie, supra*, 2014 U.S.Dist Lexis 27306 at pp. *1-2.) As described in *JM Smith*, the West Virginia complaint alleged: "[T]he drug distributors were contributing to a well-publicized prescription drug abuse epidemic in West Virginia

18

by failing to identify, block, and report excessive drug orders. It identified 'pill mills'—physicians, pharmacists, and distributors of controlled substances who write and fill excessive prescriptions—as responsible for increased abuses. The complaint also charged the drug distributors with 'substantially contributing to' the epidemic by failing to maintain sufficient controls that would flag suspicious orders as required by West Virginia law, all while the distributors were on notice that the epidemic was a current and growing problem." (*JM Smith, supra*, 602 Fed.Appx. at p. 117.) As described in *Richie*, the West Virginia complaint alleged the drug distributors "illegally distributed controlled substances by supplying physicians and drugstores with drug quantities in excess of legitimate medical need." (*Richie, supra*, 2014 U.S.Dist. Lexis 27306 at p. *2.)

In *JM Smith, supra*, 602 Fed.Appx. at page 116, the Fourth Circuit Court of Appeals held that the insurer had a duty to defend a pharmaceutical distributor in the West Virginia lawsuit because the claims alleged created a possibility of coverage under the CGL policy. The court scrutinized, count by count, the allegations of the West Virginia complaint and concluded they alleged claims based on negligence and did not allege intentional harm. (*Id.* at p. 120.) Further, under South Carolina law applicable to the policies, "accidents require that either the act *or* the injury resulting from the act be unintentional"; that is, a deliberate act is an accident if the resulting injury is unintentional. (*Ibid.*, italics added.) Under California law, in contrast, a deliberate act is not an accident, even if the injury is unintentional, unless the injury was produced by an additional, unexpected, independent, and unforeseen happening.

The court in *Richie* likewise found that the West Virginia complaint included allegations of negligent conduct that would trigger coverage under the "'occurrence'" provision of the policies. (*Richie, supra*, 2014 U.S.Dist. Lexis 27306 at p. *14.) In addition, under Kentucky law, a loss or harm is "fortuitous"—i.e. accidental—if unintended by the insured. (*Id.* at p. *11.) The court found the West Virginia complaint "sets forth allegations that the alleged harm is fortuitous and properly deemed

19

'accidental' since Richie did not intend for the alleged drug addiction to occur." (*Id.* at p. *14.) Here, as we have explained, under California law "the term 'accident' does not apply where an intentional act resulted in unintended harm." (*Frake, supra*, 197 Cal.App.4th at p. 582.)

D. *There Is No Potential for Liability Based on Negligence.*

Watson argues the duty to defend was triggered because the California Complaint and the Chicago Complaint "permit the possibility that Watson will be held liable, if at all, for conduct or omissions that are negligent." In particular, Watson argues its liability under the public nuisance cause of action of the California Complaint (the only cause of action of that complaint for which Watson seeks coverage) can be based on negligent conduct or omissions.

A "nuisance" is "[a]nything which is injurious to health" (Civ. Code, § 3479), and a "public nuisance" is "one which affects at the same time an entire community or neighborhood, or any considerable number of persons" (*id.*, § 3480). Both are remediable by civil suit or abatement. (*Id.*, §§ 3491, 3493, 3494.) The public nuisance statutes do not require a finding that the nuisance was created or furthered by intentional acts. However, "it is not the form or title of a cause of action that determines the carrier's duty to defend, but the potential liability suggested by the facts alleged or otherwise available to the insurer." (*CNA Casualty of California v. Seaboard Surety Co.* (1986) 176 Cal.App.3d 598, 609.) The duty to defend is triggered by allegations on the face of the complaint and from extrinsic information available to the insurer and whether those allegations and facts create a potential for coverage under the terms of the policy. (*Low v. Golden Eagle Ins. Co.* (2002) 99 Cal.App.4th 109, 113.)

The facts alleged in the California Complaint and the Chicago Complaint suggest potential liability based only on Watson's intentional conduct. But to the extent the complaints create a potential for liability against Watson based on unintentional conduct, the claims fall within the Products Exclusions.

20

**III.**

**The Claims Fall Within the Products Exclusions and
Therefore Are Excluded From Coverage.**

A.  *Products Exclusions:  Background*

The Products Exclusions exclude coverage for bodily injury "arising out of" (Travelers Policies) or that "results from" (St. Paul Policies) "[a]ny goods or products . . . manufactured, sold, handled, distributed or disposed of by: [¶] . . . [y]ou."  The Products Exclusions also exclude coverage for bodily injury that arises out of or results from "[w]arranties or representations made at any time, or that should have been made, with respect to the fitness, quality, durability, performance, handling, maintenance, operation, safety, or use of such goods or products."  Thus, the Products Exclusions bar coverage for bodily injury that arises out of or results from (1) goods or products manufactured, sold, handled, distributed, or disposed of by Watson and (2) warranties or representations made with respect to the fitness, quality, durability, performance, handling, maintenance, operation, safety, or use of those goods or products.

The trial court found the allegations of the California Complaint and the Chicago Complaint come within the Products Exclusions because "[a]ll of the harm that is asserted in the lawsuits—narcotics addiction, the public nuisance in the California action and the public health costs, etc. highlighted in the Chicago [Action]—stem from Watson's products and what Watson said and did not say about the products."

Policy exclusions must be construed narrowly, and the insurer has the burden of demonstrating an exclusion precludes coverage.  (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 16; *Safeco Ins. Co. v. Robert S.* (2001) 26 Cal.4th 758, 777; see *Atlantic Mutual Ins. Co. v. J. Lamb, Inc.* (2002) 100 Cal.App.4th 1017, 1039 ["an insurer that wishes to rely on an exclusion has the burden of proving, through conclusive evidence, that the exclusion applies in all possible worlds"].)

The "bodily injury" alleged by the California Complaint and the Chicago Complaint falls into two categories. The first category relates to use and abuse of opioid painkillers and includes injuries such as overdose, addiction, death, and long-term disability. The second category relates to use and abuse of heroin, the resurgence of which is alleged to have been triggered by use and misuse of opioids.

California courts have interpreted the terms "arising out of" or "arising from" broadly: "It is settled that this language does not import any particular standard of causation or theory of liability into an insurance policy. Rather, it broadly links a factual situation with the event creating liability, and connotes only a minimal causal connection or incidental relationship." (*Acceptance Ins. Co. v. Syufy Enterprises* (1999) 69 Cal.App.4th 321, 328.) Watson does not argue the term "results from" (used in the St. Paul Policies) should be interpreted differently from the term "arising out of." (See *Pension Trust Fund v. Federal Ins. Co.* (9th Cir. 2002) 307 F.3d 944, 952-953 ["'as a result of'" and "'arising out of'" should be interpreted in the same way].)

This broad interpretation of "arising out of" applies to both coverage provisions and exclusions. (*Crown Capital Securities, L.P. v. Endurance American Special Ins. Co.* (2015) 235 Cal.App.4th 1122, 1131 [applying definition to policy exclusion]; *Jon Davler, Inc. v. Arch Ins. Co.* (2014) 229 Cal.App.4th 1025, 1035-1036 [applying definition to policy exclusion]; *Southgate Recreation & Park Dist. v. California Assn. for Park & Recreation Ins*. (2003) 106 Cal.App.4th 293, 300 [arising out of "'broadly links' the exclusionary operative events with the exclusion" and is "generally equated" with "'origination, growth or flow from the event'"]; *Medill v. Westport Ins. Corp.* (2006) 143 Cal.App.4th 819, 829-830 [broad interpretation of the term "arising out of" applies to breach of contract exclusion]; *Aloha Pacific, Inc. v. California Ins. Guarantee Assn*. (2000) 79 Cal.App.4th 297, 318-319 [broad interpretation given to term "'arising out of'" in trademark exclusion in general liability insurance policy]; *Fibreboard Corp. v. Hartford Accident & Indemnity Co.* (1993) 16

22

Cal.App.4th 492, 503 ["California courts generally have given the term 'arising out of' or 'arising from' their commonsense meaning, concluding that they connote more than mere causation"]; see *Trenches, Inc. v. Hanover Ins. Co.* (9th Cir. 2014) 575 Fed.Appx. 741, 751 ["In California, the phrase 'arising out of' is construed broadly, even if in an exclusion"].)[6]

As to the first category of bodily injury, as Travelers argues, the alleged opioid epidemic and attendant ills arise out of Watson's opioid products because, simply and irrefutably, "narcotics addiction and abuse 'arise out of' narcotics." In addition, the complaints allege a direct connection between the statements and representations made by Watson in its alleged campaign to increase sales of its opioid products and the abuse, addiction, death, and other injuries caused by those products. Indeed, this campaign, which allegedly misrepresented the efficacy of opioid painkillers, overstated their benefits, and trivialized their risks, is the very basis on which liability against Watson is premised. Those statements and misrepresentations are alleged to have been made to create a "new and far broader market for [Watson's] potent and highly addictive drugs," and induce physicians to prescribe opioid painkillers for purposes to which they were unsuited. The success of Watson's marketing campaign was what is alleged to have led to the epidemic of opioid misuse.

The second category of bodily injury, the alleged resurgence in heroin use, also arises out of Watson's products. Heroin is not, of course, a product made or distributed by Watson, but that fact is not dispositive. The Products Exclusions extend, as we have explained, to bodily injury arising out of warranties or representations made by Watson in connection with its products. The complaints allege a direct causal connection between those warranties and representations and the resurgence in heroin

_____

[6] Watson urges us to use the present case as a vehicle for narrowing the meaning of "arising from" or "arising out of" in an exclusion. We agree with the definition of "arising from" or "arising out of" given in the cases cited.

use:  Watson's warranties and representations made as part of this campaign to increase the sales of highly addictive opioid painkillers allegedly had the intended effect of increasing their sales, use, and addiction, which led to a dramatic increase in the use of heroin as a cheaper alternative.  The California Complaint alleges:  "It is hard to imagine the powerful pull that would cause a law-abiding, middle-aged person who started on prescription opioids for a back injury to turn to buying, snorting, or injecting heroin, but that is the dark side of opioid use and addiction."

B.  *Federal and Out-of-State Cases*

Several federal and out-of-state cases support our conclusion the Products Exclusions bar coverage here.  *Travelers Property Casualty Co. of America v. Anda, Inc.* (11th. Cir. 2016) 658 Fed.Appx. 955 (*Anda*) addressed the application of the same exclusions to allegations of bodily injury caused by the opioid epidemic in West Virginia.  The State of West Virginia sued insured pharmaceutical companies (including Watson Pharmaceuticals, Inc.) alleging they "knowingly or negligently flooded the West Virginia market with commonly-abused drugs."  West Virginia alleged it suffered many kinds of harm, including increased crime and congested hospitals, as a result of the over-supply of the insureds' products on the market.  (*Id.* at p. 956.)  Anda, Inc. (a pharmaceutical distributor) and Watson Pharmaceuticals, Inc. (together, Anda) sought defense and indemnification under CGL polices issued by Travelers and St. Paul.  (*Id.* at pp. 956-957.)  Those policies had the same products exclusions as found in the Travelers Policies and the St. Paul Policies here.  (*Id.* at pp. 957-958.)

The Eleventh Circuit Court of Appeals, applying California law, concluded the injuries alleged had, at a minimum, a connection with the insureds' products and therefore fell within the products exclusion.  (*Anda, supra*, 658 Fed.Appx. at p. 958.)  The court explained:  "In [the West Virginia] action, the State seeks to enjoin the way Anda distributes its products.  It also seeks monetary damages arising from the injuries— whether they be 'bodily' or not—caused by these products.  At bottom, the State claims

24

that Anda and other pharmaceutical distributors have so flooded the market with their products that West Virginia suffers from an opioid epidemic. As a result of that epidemic, the State has suffered monetary losses that it now seeks to recover. The causal connection between Anda's products and the injuries alleged by the State is sufficient to meet the low bar set by California law. Accordingly, we conclude that all the underlying claims, if covered at all, are embraced within the Travelers and St. Paul Products Exclusions, which render any coverage inapplicable." (*Id.* at pp. 958-959.)

The only significant difference between *Anda* and this case is that the California Complaint and the Chicago Complaint also allege liability for a resurgence in heroin use allegedly triggered by Watson's products. But as we have explained, although heroin is not a Watson product, the alleged resurgence in heroin use arises out of Watson's opioid products and the statements and representations Watson made about them.

The Florida Supreme Court, in *Taurus Holdings v. U.S. Fidelity* (Fla. 2005) 913 So.2d 528 (*Taurus*) addressed whether CGL insurance policies excluded coverage for lawsuits brought by municipalities against gun manufacturers to recover the costs of medical and other services incurred as a result of gun violence. The court held there was no coverage because the claims fell within exclusions for "'bodily injury and property damage . . . arising out of your product.'" (*Id.* at p. 530.) The court interpreted the term "'arising out of'" broadly to mean ""'originating from," "having its origin in," "growing out of," "flowing from," "incident to" or "having a connection with."'" (*Id.* at pp. 532-533, 536.) The court then applied this broad interpretation and concluded the policies excluded claims against the gun manufactures when the injuries alleged were caused by guns manufactured by the insured. The court explained: "The provision at issue excludes coverage for 'all bodily injury and property damage . . . arising out of your product.' The underlying complaints allege damages for increased health care costs and the increased costs for police and emergency medical services due to gun violence, and

25

the costs associated with the prosecution of gun-related crimes.  The allegations in the complaints all 'concern off-premises conduct arising out of (not merely incidentally related to) firearms products.'  [Citation.]  The bodily injuries alleged all originated from [the insured]'s products—that is, the discharge of their manufactured guns.  (*Id.* at p. 540.)

Three federal court decisions, all cited by the Florida Supreme Court in *Taurus*, reached the same conclusion.  (*Brazas Sporting Arms v. American Empire Surplus* (1st Cir. 2000) 220 F.3d 1; *Beretta U.S.A. Corp. v. Fed. Ins. Co.* (4th Cir. 2001) 17 Fed.Appx. 250; *Mass. Bay Ins. Co. v. Bushmaster Firearms* (D.Me. 2004) 324 F.Supp.2d 110.)  In each case, the court concluded that a products exclusion provision operated to exclude coverage for claims against a gun manufacturer for injuries allegedly caused by the guns the insured had manufactured.

C.  *Watson's Arguments*

1.  *The Conduct Alleged Was Connected With the Products.*

Watson argues the Products Exclusions do not apply because the alleged harm was caused by "conduct sufficiently independent of the product's design and manufacture."  In support of this argument, Watson cites *Aetna Casualty & Surety Co. v. Richmond* (1977) 76 Cal.App.3d 645 (*Richmond*) and *McGinnis v. Fidelity & Casualty Co.* (1969) 276 Cal.App.2d 15 (*McGinnis*).

In *Richmond, supra*, 76 Cal.App.3d at page 648, the insured, a sporting goods store, was sued by a customer who was injured when ski bindings she bought at the insured's store failed to release properly.  Based on a products exclusion (called a completed operations or products hazard), the insurer denied the insured's demand for defense and indemnification.  (*Ibid.*)  Although the insured did not manufacture the ski bindings, an employee of the insured adjusted the bindings and affixed them to the skis.  (*Ibid.*)  The Court of Appeal concluded the insurer had no duty to defend or indemnify because the products exclusion included workmanship on the products.  (*Id.* at p. 654.)

"The critical issue," the court stated, "is whether the product was defective with respect to its intended use." (*Ibid.*) If the product was defective, the fact that the negligence of insured's employee in adjusting the bindings "contributed to the existence of the defect" did not take the cause of action alleged out of the products exclusion. (*Id.* at pp. 654-655.) "Only where negligent service of the insured constitutes 'an act sufficiently removed from the quality of the product in question [will it] escape the exclusionary clause.'" (*Id.* at p. 655.)

In *McGinnis, supra*, 276 Cal.App.2d at page 16, a boy was injured when gunpowder purchased at the insured's gun and ammunition store exploded. The insurer disclaimed liability under the policy based on an exclusion for bodily injury arising out of "[g]oods or products manufactured, sold, handled or distributed by the insured." (*Id.* at pp. 16-17.) The Court of Appeal concluded the claim fell outside the exclusion because the injury was not caused by a defective product: "The powder did exactly what it was designed to do, and what everyone expected it to do; it exploded when detonated. Consequently this is not a products liability case because no negligence can be attributed to the manufacturer. Stated another way, [the insured] was negligent in selling to the minor, and his negligence was a proximate cause of the accident." (*Id.* at p. 17.)

According to Watson, *Richmond* and *McGinnis* correctly state a rule that a products exclusion does not apply if the bodily injury is caused by conduct sufficiently independent or removed from the product's design and manufacture. In that situation, the products exclusion would not bar coverage because there would be a potential for coverage based on a nonexcluded cause—the insured's conduct.

As we see it, *Richmond* and *McGinnis* support the conclusion the Products Exclusions bar coverage here. In *Richmond*, the Court of Appeal concluded that the conduct of the insured's employee in adjusting the bindings and attaching them to the skis did not take the claim out of the products exclusion because that negligent conduct was connected with the bindings' defects. Here, although the Watson's opioid products

27

are not alleged to be defective, Watson's statements and representations about them were closely connected with ("not sufficiently removed from") the claims they were overprescribed and misused. Watson's alleged liability arises out of allegations that Watson launched a marketing campaign to sell a nondefective product for a purpose for which it was unsuited. In *Cravens v. Dargan & Co. v. Pacific Indem. Co.* (1972) 29 Cal.App.3d 594, 599, the Court of Appeal, distinguishing *McGinnis*, concluded that a claim for injury from the insured's insecticide product fell within a products exclusion. Although the insecticide was not defective, the insured knew its proper purpose but recommended and sold the product for an unsuitable use. (*Ibid.*) This case is the same: Although Watson's opioid products are not alleged to be defective, it is alleged Watson marketed and sold them for a purpose for which Watson knew they are not suited, i.e., treatment of long-term, chronic, nonacute pain.

2. *The Products Exclusions Are Not Limited to Defective Products.*

Although Watson does not expressly state as much, its argument is premised on the proposition that products exclusions, such as those in Travelers Policies and the St. Paul Policies, exclude only injuries caused by defective products. Here, the Products Exclusions by their terms are not limited to defective products but quite plainly exclude bodily injury arising out of "[*a*]*ny goods or products* . . . manufactured, sold, handled, distributed or disposed of by: [¶] . . . [y]ou." (Italics added.)

The California Supreme Court has not addressed whether the term "any product" in a Products-Completed Operations Hazard exclusion is limited to defective products. In *Taurus, supra,* 913 So.2d 528, the Florida Supreme Court addressed that issue in a case involving the same exclusion found in the policies in this case. The Florida Supreme Court acknowledged a split of authority among jurisdictions and listed both cases limiting the exclusion to defective products and those holding the exclusion applies more broadly. (*Id.* at p. 536.) The Florida Supreme Court concluded the exclusion did not apply only to defective products: "We do not believe that a fair reading

28

of the exclusion at issue here would apply it *only* to defective products. Certainly the word 'defective' is found nowhere in the exclusion. The language is much broader, applying the exclusion to 'all bodily injury and property damage . . . arising out of your product.' The term 'your product' is defined as 'any goods or products . . . manufactured, sold, handled, distributed or disposed of by' Taurus. The word 'any' before 'goods or products' connotes a scope extending beyond merely defective products. Therefore, nothing in the text of the exclusion suggests it applies only to defective products. . . . The plain language of the exclusion in this case excludes coverage for all product-related injuries, not merely defective products." (*Id.* at pp. 536-537.)

We agree with the analysis of the Florida Supreme Court and likewise conclude the term "any product" in the Product Exclusions of the Travelers Policies and the St. Paul Policies is not limited to defective products. Thus, whether or not the opioid products manufactured, sold, or distributed by Watson were defective is not alone decisive of the issue whether the Products Exclusions apply. We are not bound by *Richmond* or *McGinnis* (see *Sarti v. Salt Creek* (2008) 167 Cal.App.4th 1187, 1193 ["there is no horizontal stare decisis in the California Court of Appeal"]), and we disagree with those decisions to the extent they state a different rule.

3. *"Arising Out Of" Does Not Equate to Tort Causation.*

Even if Watson's products were *a* cause of the harm, Watson contends the Products Exclusions do not apply because there are other, concurrent proximate causes of the harm alleged that are independent of the design and manufacture of the opioid drugs. The terms "arising out of" and "arising from" do not regulate the standard of causation. (*Fibreboard Corp. v. Hartford Accident & Indemnity Co., supra*, 16 Cal.App.4th at pp. 504-505.) Instead, those terms "identif[y] a core factual nucleus, i.e., products manufactured, sold or distributed by the insured, and links that nucleus to the bodily injury or property damage covered under the policy. This link is not made in terms of tort causation." (*Id.* at p. 505.)

29

Moreover, the California Complaint and the Chicago Complaint allege, expressly or by inference, lack of concurrent proximate causation. The reason that doctors and other medical professionals misprescribed opioid painkillers is alleged to have been the successful marketing efforts by Watson. The California Complaint alleges: "Nor is Defendants' causal role broken by the involvement of doctors, professionals with the training and responsibility to make individualized medical judgment for their patients. Defendants' marketing efforts were ubiquitous and highly persuasive. Their deceptive messages tainted virtually every source doctors could rely on for information and prevented them from making informed treatment decisions." The allegations of the complaints thereby foreclose the potential of proximate concurrent causation.

4. *The Products Exclusions Are Not Ambiguous.*

Watson argues the Products Exclusions are ambiguous due to an exception in section 2.d(3) of the Travelers Policies. The exception in section 2.d(3) is for "products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit." This exception, like so many provisions in a CGL policy, takes some effort to understand, but that does make it ambiguous. We agree with the explanation given by Travelers that "if the parties elected to exempt any particular products or operations from the Products Exclusion, they were required to list the relevant classification on the Declarations page or on a policy schedule, and note that the products or operations within that classification are subject to the General Aggregate Limit."

Here, neither the Declarations page nor any policy schedule states that any classification of products claims were subject to the general aggregate limit. The Declarations page states that the Travelers Policies have a general aggregate limit that applies to claims "[o]ther than Products-Completed Operations." Because no classification of products claims is listed on the Declarations page or a policy schedule, all products and operations are subject to the Products Exclusions.

30

## DISPOSITION

The judgment is affirmed.  Respondents shall recover costs on appeal.


FYBEL, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


MOORE, J.