Filed 3/10/23  Eljac Enterprises, Inc. v. Berkshire Hathaway etc. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| ELJAC ENTERPRISES, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> BERKSHIRE HATHAWAY SPECIALTY INSURANCE COMPANY, <br><br> Defendant and Respondent. | B312799 <br><br> (Los Angeles County Super. Ct. No. 18STCV00829) <br><br><br> ORDER <br> [NO CHANGE IN  JUDGMENT] |

BY THE COURT:

It is ordered that the opinion filed herein on March 3, 2023, is modified as follows:

On page 1, the paragraph beginning with "Lewis Brisbois Bisgaard & Smith" is changed by deleting the name "Jordan" and adding the name "Jordon" so the sentence reads:

Lewis Brisbois Bisgaard & Smith, Jordon E. Harriman and Jeffry A. Miller, for Defendant and Respondent.

There is no change in judgment.

_____

RUBIN, P. J.                    MOOR, J.                    KIM, J.

Filed 3/3/23  Eljac Enterprises, Inc. v. Berkshire Hathaway etc. CA2/5 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| ELJAC ENTERPRISES, INC., Plaintiff and Appellant, v. BERKSHIRE HATHAWAY SPECIALTY INSURANCE COMPANY, Defendant and Respondent. | B312799 (Los Angeles County Super. Ct. No. 18STCV00829) |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, Maureen Duffy-Lewis, Judge.  Affirmed.

Thomas & Elliott, Stephen L. Thomas and Jay J. Elliott; Benedon & Serlin, Gerald M. Serlin and Melinda W. Ebelhar, for Plaintiff and Appellant.

Lewis Brisbois Bisgaard & Smith, Jordan E. Harriman and Jeffry A. Miller, for Defendant and Respondent.

# I.     INTRODUCTION

Plaintiff[1] appeals from the trial court's granting of a motion for summary judgment filed by the insurance company[2] on the complaint for declaratory relief, breach of contract, and unfair competition[3]. It also appeals from the court's denial of its cross-motion for summary adjudication on certain duty issues, including the duty to defend. We affirm.

# II.    FACTUAL BACKGROUND

A.    *The Agency Relationships*

In July 2014, Travel Leaders Collection, LLC (Tzell)—a national travel management company with a network of travel agencies across the United States—entered into a branch office agreement with Carlisle (agent agreement). Pursuant to the agent agreement, Carlisle operated a Tzell office in California that was authorized:  (1) to issue airline tickets through Tzell's

---

[1]    The plaintiff insured is ELJAC Enterprises, Inc., dba Carlisle Travel (Carlisle).

[2]    The defendant insurance company is Berkshire Hathaway Specialty Insurance Corporation (Berkshire).

[3]    The third cause of action alleged violations of Business and Profession Code section 17200 et seq. (UCL).

account with Airline Reporting Corporation (ARC);[4] and (2) to book airline reservations, ticket exchanges, and ticket refunds through Sabre.[5]

In May 2016, Carlisle entered into an independent contractor's agreement (contractor agreement) with a New York travel agency, Highview Travel (Highview). Pursuant to the contractor agreement, Highview was authorized to exercise Carlisle's rights, under the agent agreement, to use "Tzell's ARC and Sabre privileges."

Commissions under the agent and contractor agreements were paid as follows: When Highview sold a ticket for air travel using Tzell's ARC account, the ARC computer system would pay on behalf of the carrier an earned commission to Tzell. Tzell would then deduct its share of the earned commission under the agent agreement and pay the balance to Carlisle. Carlisle, in turn, would retain 10 percent of the commission balance under the contractor agreement and remit the other 90 percent to Highview.

If Highview later cancelled the ticket through the ARC computer system, as required, the entire commission paid by the carrier would be deemed "unearned" and the system would

---

[4] ARC is a central clearinghouse used by airlines and travel agencies to process all airline ticket purchase, exchange, and refund transactions in the United States.

[5] According to Carlisle, "In addition to ARC, there are four Global Distribution Systems (GDS), one of which is . . . Sabre. Sabre is a software company that allows . . . travel agents to book airline reservations, exchange airline tickets, and refund airline tickets. Sabre . . . also allow[s] travel agents to book hotels and car rentals."

automatically deduct the amount of the unearned commission from new commissions owed by the carrier to Tzell for unrelated ticket sales.

B.      *The Disputed Commissions*

During 2017, Highview—using Tzell's ARC account and the Sabre system—issued a large volume of tickets for air travel on United Airlines (United) and was paid commissions for those sales as described above. According to Carlisle, each of those United transactions followed the same pattern: "Someone at Highview made a reservation on United . . . using Sabre. As far as United and Sabre [could] see, Tzell [was] making th[e] reservation. Making a reservation in Tzell's name [was] possible because: (1) Carlisle use[d] an ARC branch number belonging to Tzell under the [agent] agreement, (2) Highview use[d] Carlisle's Sabre identification number under the [contractor] agreement, and (3) Sabre [was] programmed by the system vendor to make it appear [that] the reservation [was] made by Tzell. . . . [At the time of the reservation] or shortly thereafter, someone at Highview caused a ticket to be issued covering the reservation, also using Sabre. The price was paid for using an American Express card. During the ticketing steps, Highview input the commission at 20 [percent] of the ticket price, which [was] the Tzell commission rate and which Highview was authorized by Carlisle to do." Within a week, ARC deposited the 20 percent commission into Tzell's bank account. "Within a day or so," Tzell forwarded the commission to Carlisle, and Carlisle then paid Highview's share of the commission "[w]ithin 15 days after the end of the month during which the ticket was issued."

4

"Carlisle believe[d] that some time after the ticket was issued, someone at Highview avoided using ARC or Sabre, [and] instead went to United.com and requested a refund for the ticket, which United allowed." "Carlisle [also] believe[d] that the only conceivable reason for not processing the refund in the usual way was to deceive Carlisle into paying the 90 [percent commission] . . . ." By obtaining commissions and refunds in this manner, Highview was able to accumulate approximately $300,000 in unearned commissions. Shortly after discovering the issue, Carlisle "ceased doing business with [Highview]."

According to Carlisle, when it discovered "the computer glitch and the nearly $300,000 in 'unearned' commissions that had not been charged back," it disclosed the issue to United, Tzell, and Highview. Following its own audit, United asked Tzell to pay back the entire amount of the unearned commissions.

C.     *The Claims Against Carlisle*

On November 8, 2017, United made a demand on Carlisle to repay $265,612 in unearned commissions (United claim). Carlisle calculated that Highview's share of this claim was $240,000, which Highview refused to return to United voluntarily.

On March 14, 2018, Tzell sent a letter to Carlisle demanding a payment of $265,412 (the Tzell claim), the amount United had charged Tzell to recover commissions paid to Carlisle. According to Tzell, its "liability for [that] sum [was] due to negligent acts and omissions by [Carlisle] in supervising its agent(s) [Highview] who repeatedly and continuously misused the system and the process to [its] own advantage and to the

5

disadvantage of Carlisle and Tzell." Tzell criticized Carlisle for hiring Highview and for its failure to monitor that agent and have "systems or processes in place that would have prevented this type of agent abuse.'"

D.    *Professional Liability Policy*

Berkshire issued a professional liability policy to Carlisle for the period October 4, 2016, through October 4, 2017 (the policy). The coverage clause provided: "[Berkshire] will pay on behalf of [Carlisle] those sums that [Carlisle] becomes legally obligated to pay as [d]amages to which this insurance applies by reason of an act or omission committed anywhere in the world by [Carlisle], or any person for whom [Carlisle] is legally liable, in the performance of [t]ravel [a]gency [o]perations by [Carlisle] provided such act or omission occurs during the [p]olicy [p]eriod. [¶] The [c]ompany shall also pay [c]laim [e]xpenses in connection with covered [c]laims. **Claim [e]xpenses** are in addition to the [l]imits of [l]iability shown in the [d]eclarations."

The policy set forth certain exclusions from coverage, including paragraph O, which provided: "This policy does not apply to any [c]laim: [¶] . . . [¶] O. Based upon or arising out of any . . . act or omission . . . which is . . . dishonest, fraudulent, malicious, or criminal."

The policy also included a defense provision which stated, in pertinent part: "[Berkshire] shall have the right and duty to defend any [c]laim against [Carlisle] seeking [d]amages on account of . . ., an act or omission, . . . to which this insurance applies, even if any of the allegations of the [c]laim are groundless, false or fraudulent. [Berkshire] shall have the right

6

to appoint counsel and to conduct such investigation and settlement of any [**c**]**laim** as it deems appropriate. . . ."

Under the "Supplementary Payments" provision, Berkshire agreed to pay "with respect to any [c]laim to which this insurance applies:  [¶]  . . .  [¶]  All reasonable expenses incurred by [Carlisle] at [Berkshire's] request to assist [Berkshire] in the investigation or defense of the [c]laim, including actual loss of earnings up to $250 a day because of time off from work . . . ."

E.      *Carlisle's Tender of the Claims to Berkshire*

On December 12, 2017, Carlisle tendered the United claim to Berkshire, demanding a defense and indemnity against the amount of that claim.

On January 26, 2018, Berkshire denied coverage. Berkshire explained, among other things, that "[t]he policy extends coverage for 'damages' caused by an act or omissions committed by [Carlisle] and does not provide coverage for dishonest, fraudulent, malicious, or criminal acts."

On March 14, 2018, Tzell made a claim against Carlisle "to recover commissions United paid on behalf of Carlisle in the amount of $265,412."  Two days later, Carlisle's vice president, Jerry Saxe, forwarded the Tzell claim to Berkshire.  On April 23, 2018, a Berkshire claims adjustor sent an e-mail to Saxe requesting additional information.  On April 24, 2018, Saxe responded to Berkshire's request and explained that the "commissions were paid to Highview . . . , an agency in New York [that] was performing travel booking services for and on behalf of Carlisle.  [Tzell] claims that the commissions paid were based on improper bookings of airline tickets by Highview . . . which were

later cancelled without Highview . . . returning the commissions it was paid. [Tzell] claims that it has been damaged because it is obligated to reimburse the airline for the commissions that were paid to Highview . . . and [Tzell] alleges that Carlisle's failure to properly manage and supervise Highview . . . [was] the cause of its damage.'" Saxe concluded by requesting coverage for and a defense of the Tzell claim.

On May 8, 2018, Berkshire denied Carlisle's request for coverage of the Tzell claim and refused to provide a defense. Berkshire explained: "Although the allegations by [Tzell] state there were 'negligent acts and omissions' by Carlisle, your . . . policy specifically excludes the allegations being claimed. As such, there is no coverage for the request for reimbursement. The policy affords coverage for 'damages' caused by an act or omission[] committed by [Carlisle] during the policy period and does not provide coverage for dishonest, fraudulent, malicious, or criminal acts."

On May 10, 2018, Saxe sent Berkshire a letter contesting its coverage and defense decisions and requesting a detailed explanation of the investigation Berkshire had conducted prior to making those decisions. In a May 11, 2018, e-mail, Berkshire informed Carlisle that it had referred Carlisle's request to coverage counsel.

On June 14, 2018, coverage counsel for Berkshire sent Carlisle's attorney a letter asking multiple questions about the underlying claims and requesting copies of various documents.

On June 22, 2018, coverage counsel sent an e-mail to Carlisle's attorney advising that Berkshire had "agreed, subject to a full and complete reservation of rights, to your request for payment to Carlisle pursuant to the policy's Supplemental

8

Payments provision of up to $250 per day to cover reasonable costs incurred in responding to our information request. Please provide an estimate or budget for such costs."

On June 24, 2018, Carlisle's attorney sent Berkshire's coverage counsel an e-mail enclosing an invoice for "Supplementary Pay at $70 per hour" detailing the time Saxe had spent on the matter from March 13, 2018, through June 22, 2018, and requesting a total payment of $4,810. The invoice included seven entries for the time expended from June 14, 2018, to June 22, 2018, the total amount of which was $1,750.

On July 9, 2018, Saxe e-mailed Berkshire's coverage counsel answering Berkshire's questions.[6] And, on July 11, 2018, Berkshire's coverage counsel responded to Carlisle's attorney by reaffirming its decision to deny coverage. Among other facts, Berkshire's letter noted that most, if not all, of the United ticket purchases were charged to two American Express credit cards issued to Highview personnel and that, when United issued a refund, it would be credited to a different card than the one used to purchase the ticket. According to the letter, United had issued approximately $1.4 million in refunds to Highview, and Carlisle had asked the U.S. Attorney's office to bring criminal charges against the two Highview employees involved, both of whom had been terminated. Citing, among other policy provisions, the exclusion in paragraph O, Berkshire concluded that it would "neither defend nor indemnify Carlisle against the [Tzell] claim[], nor [would it] solicit or accept an offer to settle that claim against

---

[6] In their joint stipulation of facts, the parties agreed that the information provided in Saxe's July 9, 2018, letter "accurately reflect[ed] Carlisle's understanding of the relevant facts of the claims as conveyed to [Berkshire]." (Emphasis omitted.)

Carlisle.  Therefore, Berkshire [would not] pay the defense invoices submitted by . . . Carlisle.  Berkshire had offered to pay up to $250 per day to cover the reasonable costs incurred by Carlisle in responding to [Berkshire's] June 14, 2018[,] information requests.  [Berkshire] asked for an estimate [of] or budget for those costs.  No estimate or budget was received and [Berkshire had] not been provided invoices specific to costs incurred by Carlisle in responding to those requests.  Consequently, no reimbursement [would] be made at this time."

In a July 18, 2018, e-mail to Berkshire's coverage counsel, Saxe attached a demand letter Carlisle received from Tzell's attorney and requested that Berkshire reconsider its position on coverage and a defense.

On July 20, 2018, Berkshire's coverage counsel responded to Saxe's request for reconsideration, explaining that nothing in Tzell's demand letter warranted a change in Berkshire's position on the coverage and defense issues.

According to Carlisle, without any contribution from Berkshire, it negotiated a partial settlement with Tzell under which it returned $26,561, representing the 10 percent it withheld from the unearned commission it paid to Highview, and agreed to pay an additional ten monthly payments of $24,000, representing the $240,000 balance of the amount Tzell paid to United.

In July and August 2019, Berkshire issued two checks to Carlisle, in the amounts of $1,928.84 and $4.79, in reimbursement for Carlisle's costs in responding to Berkshire's

10

requests for information from June 22, 2018, through July 10, 2019.[7]

## III. PROCEDURAL BACKGROUND

In October 2018, Carlisle filed a complaint against Berkshire asserting three causes of action for: (1) breach of contract based on Berkshire's alleged breach of its promise to pay Carlisle for the "'reasonable costs incurred in responding to [Berkshire's] information request'" and its failure "to provide the policy benefits described in the [policy];" (2) declaratory relief regarding the "nature and scope of Berkshire['s] . . . duties to Carlisle in Tzell's lawsuit pursuant to the [policy]," including whether Berkshire's "reservation of rights create[d] a duty on the part of Berkshire . . . to provide independent counsel to Carlisle in Tzell's lawsuit;" and (3) violation of the the UCL based on Berkshire's alleged breach of: (a) its duty to adopt written standards for the prompt investigation and processing of claims and (b) its duty to "attempt in good faith to effectuate prompt, fair, and equitable settlement" of first and third party claims.

The parties filed an initial set of cross-motions for summary adjudication or, in the alternative, summary judgment. The trial court denied Carlisle's motion in its entirety and denied Berkshire's motion on the first cause of action, but granted

---

[7]     As noted above, the June 24, 2018, invoice included a request for $1,750 for the work Saxe conducted beginning on June 14, 2018. Carlisle does not dispute that it was compensated for Saxe's time from June 14, 2018. Instead, it contends that it was entitled to receive the entire amount of its June 22, 2018, invoice, which included a request for payment for work beginning on March 13, 2018.

11

judgment on the pleadings in favor of Berkshire on the second and third causes of action.[8]  As to the third cause of action, the UCL claim, the court granted judgment on the pleadings, finding that "[i]n a coverage matter, there is no [UCL] claim available to [Carlisle], [*Moradi-Shalal v. Fireman's Fund Insurance Companies*] (1988) 46 [Cal.]3d 287 [(*Moradi-Shalal*)].  Therefore, the allegations are not sufficient and judgment on the pleadings is granted without leave."  (Emphasis omitted.)

Carlisle then filed a petition for writ of mandate in this court and, on October 5, 2020, we issued an alternative writ requiring the trial court to vacate and reconsider its ruling on the second and third causes of action or, in the alternative, to appear and show cause why Carlisle's petition should not be granted as to those to two claims.  On the third cause of action for violation of the UCL, we explained that "the insured may assert [UCL claims] against insurers in coverage actions.  (See e.g. *Zhang v. Superior Court* (2013) 57 Cal.4th 364, 369 [(*Zhang*)].)"

In response to the alternative writ, the trial court vacated its prior order on the cross-motions and ordered the parties to refile their motions.  The parties complied on November 2, 2020, by filing the motions that are the subject of this appeal.

Berkshire filed a motion for summary judgment or, in the alternative, summary adjudication of issues, arguing it was entitled to summary adjudication of:  (1) the second cause of action for declaratory relief because it owed no duty under the policy to defend or indemnify Carlisle for either the United or Tzell claims; (2) the first cause of action because (a) Berkshire did

_____

[8]     On our own motion, we take judicial notice of Carlisle's writ petition, *ELJAC Enterprises v. Superior Court*, B307483 and exhibits in support.

12

not breach any duty to defend or indemnify Carlisle for the United and Tzell claims and (b) Berkshire did not breach the supplementary payment provision or any other agreement to pay Carlisle's investigation expenses; and (3) the third cause of action for violation of the UCL because (a) Carlisle had suffered no actual injury and therefore had no standing to bring the claim and (b) awarding equitable relief under the statute was unnecessary or inappropriate because Carlisle had an adequate remedy at law.

Carlisle filed a motion for summary adjudication of duty issues, seeking an adjudication of five issues (but no causes of action).

After conducting a hearing, the trial court issued a minute order granting Berkshire's motion for summary judgment and denying Carlisle's motion for summary adjudication. The court concluded that: there was no coverage for the United and Tzell claims because, among other things, the exclusion in paragraph O for claims arising from dishonest acts barred coverage; and because there was no coverage under the damages clause and the two exclusions,[9] there was no duty to defend.

The trial court then granted Berkshire's motion as to the breach of contract claim, finding "[a]s [Berkshire] did not have a duty to defend, there can be no breach."

---

[9]    The court also concluded that there was no coverage for the claims because United and Tzell sought restitution and disgorgement, not damages, and the claims were excluded by paragraph HH of the policy as a claim arising from the failure to collect or pay money.

The trial court also granted Berkshire's motion as to the claim for declaratory relief finding that "the court can't declare that [Berkshire] had a duty to defend."

As to the UCL claim, the trial court found, "[a]s [Berkshire] had no duty to defend, this cannot be the basis for any claim of improper, illegal nor unfair business practice.  There is insufficient evidence provided for any other claim of improper, illegal or unfair business practice."

Finally, the trial court denied Carlisle's motion for summary adjudication.

On May 7, 2021, Carlisle filed a notice of appeal from the trial court's orders.  On April 6, 2022, the court entered judgment in favor of Berkshire and, at Carlisle's request, we deemed its notice of appeal as taken from that judgment.

## IV.   DISCUSSION

Carlisle appeals from the trial court's orders (1) granting Berkshire's motion for summary adjudication/judgment and (2) denying Carlisle's motion for summary adjudication.

A.   *Standard of Review*

"""A trial court properly grants a motion for summary judgment only if no issues of triable fact appear and the moving party is entitled to judgment as a matter of law.  (Code Civ. Proc., § 437c, subd. (c); see also *id.*, § 437c, subd. (f) [summary adjudication of issues].)""" (*State of California v. Allstate Ins. Co.* (2009) 45 Cal.4th 1008, 1017.)  "We review the trial court's decision [on a summary judgment motion] de novo, considering

14

all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports. [Citation.]" (*Merrill v. Navegar, Inc.*(2001) 26 Cal.4th 465, 476.)

"[I]n moving for summary judgment, a 'defendant . . . has met' his 'burden of showing that a cause of action has no merit if' he 'has shown that one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to that cause of action.  Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto.  The plaintiff . . . may not rely upon the mere allegations or denials' of his 'pleadings to show that a triable issue of material fact exists but, instead,' must 'set forth the specific facts showing that a triable issue of material fact exists as to that cause of action or a defense thereto.' (Code Civ. Proc., § 437c, subd. (o)(2).)" (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849 (*Aguilar*).)

In making a motion for summary judgment, a defendant may rely on the complaint in framing the issues upon which it seeks adjudication.  "The pleadings play a key role in a summary judgment motion.  '"The function of the pleadings in a motion for summary judgment is to delimit the scope of the issues . . ."'" and to frame 'the outer measure of materiality in a summary judgment proceeding.' [Citation.]  . . . 'The materiality of a disputed fact is measured by the pleadings [citations], which "set the boundaries of the issues to be resolved at summary judgment." [Citations.]' [Citation.]  Accordingly, the burden of a defendant moving for summary judgment only requires that he or she negate plaintiff's theories of liability *as alleged in the*

15

*complaint*; that is, a moving party need not refute liability on some theoretical possibility not included in the pleadings. [Citations.]" (*Hutton v. Fidelity National Title Co.* (2013) 213 Cal.App.4th 486, 493.)

## B.    *Second Cause of Action:  Declaratory Relief*[10]

The second cause of action alleged generally that there was an actual controversy between the parties "regarding the nature and scope of Berkshire['s] . . . duties to Carlisle in Tzell's lawsuit pursuant to the [policy]" and sought declarations that "the rights and duties of the parties be adjudged" in its favor.  The only specific declaration it sought, however, was "that [Berkshire's] reservation of rights creates a duty on the part of [Berkshire] to provide independent counsel to Carlisle in Tzell's lawsuit."

In its motion, Berkshire framed the issues to be adjudicated on that claim as whether it owed Carlisle a duty to defend and indemnify against the United and Tzell claims. Because Carlisle concedes that it is only seeking "recovery from Berkshire of its reasonable and necessary costs of defense," the issue on appeal concerning the second cause of action is limited to whether Berkshire had a duty to defend, that is, whether the undisputed facts showed that there was a potential for coverage

---

[10]    "'To qualify for declaratory relief, [a party] would have to demonstrate its action presented two essential elements:  "(1) a proper subject of declaratory relief, and (2) an actual controversy involving justiciable questions relating to [the party's] rights or obligations . . . ."'  [Citation.]" (*Jolley v. Chase Home Finance, LLC* (2013) 213 Cal.App.4th 872, 909 (*Jolley*).)

16

under the express terms of the policy for the United and Tzell claims.[11]

    1.    <u>Legal Principles</u>

"The duty to defend is broader than the duty to indemnify. [Citation.] 'Unlike the obligation to indemnify, which is only determined when the insured's underlying liability is established, the duty to defend must be assessed at the very outset of a case. An insurer may have a duty to defend even when it ultimately has no obligation to indemnify, either because no damages are awarded in the underlying action against the insured, or because the actual judgment is for damages not covered under the policy.' [Citation.]

"The duty to defend is guided by several well-established principles. An insurer owes a broad duty to defend against claims that create a potential for indemnity under the insurance policy. [Citation.] An insurer must defend against a suit even "'where the evidence suggests, but does not conclusively establish, that the loss is not covered.'" [Citation.]

"'Determination of the duty to defend depends, in the first instance, on a comparison between the allegations of the complaint and the terms of the policy. [Citation.] But the duty also exists where extrinsic facts known to the insurer suggest

---

[11]    At the end of its opening and reply briefs, Carlisle discusses the duty to investigate, without linking that discussion to a specific cause of action. Because Carlisle does not expressly contend that it was entitled to declaratory relief on the duty of investigation, we do not consider that issue in connection with the trial court's ruling in Berkshire's favor on the second cause of action.

that the claim may be covered.' [Citation.] This includes all facts, both disputed and undisputed, that the insurer knows or "'becomes aware of'" from any source [citation], 'if not "at the inception of the third party lawsuit," then "at the time of tender"' [citation]. 'Moreover, that the precise causes of action pled by the third party complaint may fall outside policy coverage does not excuse the duty to defend where, under the facts alleged, reasonably inferable, or otherwise known, the complaint could fairly be amended to state a covered liability.' [Citation.] Thus, '[i]f any facts stated or fairly inferable in the complaint, or otherwise known or discovered by the insurer, suggest a claim potentially covered by the policy, the insurer's duty to defend arises and is not extinguished until the insurer negates all facts suggesting potential coverage.' [Citation.] In general, doubt as to whether an insurer owes a duty to defend 'must be resolved in favor of the insured.' [Citation.]

"While the duty to defend is broad, it is 'not unlimited; it is measured by the nature and kinds of risks covered by the policy.' [Citation.] In an action seeking declaratory relief concerning a duty to defend, 'the insured must prove the existence of a *potential for coverage,* while the insurer must establish *the absence of any such potential.* In other words, the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot.*' [Citation.] Thus, an insurer may be excused from a duty to defend only when "'the third party complaint can by no conceivable theory raise a single issue which could bring it within the policy coverage.'" [Citation.] . . . [¶]

"In determining whether a claim creates the potential for coverage under an insurance policy, 'we are guided by the

principle that interpretation of an insurance policy is a question of law.' [Citation.]" (*Hartford Casualty Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 287–288.)

2.      Analysis

Berkshire advanced three reasons in support of its contention that there was no potential coverage for the United and Tzell claims—the definition of damages that expressly excluded coverage for restitution and disgorgement and the exclusions in paragraphs O and HH.  We conclude that the paragraph O exclusion of claims arising out of the dishonest acts of Carlisle or persons for whom it was liable[12] eliminated any reasonable potential for coverage in this case.

In his April 24, 2018, letter to Berkshire, Saxe explained that the commissions at the core of the dispute with Tzell "were based on improper bookings of airline tickets by Highview" which were later canceled without returning the commissions.  In his subsequent July 9, 2018, e-mail to Berkshire's coverage counsel setting forth in detail the facts underlying the claims, Saxe described a scheme developed by Highview to circumvent the ARC and Sabre systems that resulted in the unearned commissions retained by Highview.  He conceded that the "only conceivable" reason for avoiding those systems and instead using United.com for the cancellation and refund transactions was "to

---

[12]     The policy covered independent contractors working under contract with Carlisle if they were conducting Carlisle's travel agency operations.  It is undisputed that Highview was engaged in the conduct of Carlisle's travel agency operations when it sold and issued the United tickets at issue.

19

deceive" the parties responsible for making the commission payments to Highview. According to Carlisle, when confronted with the scheme, Highview refused to voluntarily return the commissions to United, and shortly thereafter Carlisle ceased doing business with Highview.

In addition, Carlisle's attorney informed Berkshire that two Highview employees used one of two American Express cards issued by Highview to charge the cost of the United tickets and then arranged for a refund credited to a different card. The employees were subsequently terminated by Highview, and Carlisle referred them to the U.S. Attorney's office for potential criminal prosecution.

Taken together, these facts showed that the claims were based on the actions of Carlisle's contractor, Highview, and that the actions were undertaken to deceive the parties responsible for paying the unearned commissions. Under paragraph O, the risk of loss arising from[13] such dishonest acts[14] had been expressly

---

[13] "California courts have interpreted the terms 'arising out of' or 'arising from' broadly: 'It is settled that this language does not import any particular standard of causation or theory of liability into an insurance policy. Rather, it broadly links a factual situation with the event creating liability, and connotes only a minimal causal connection or incidental relationship.' [Citation.] . . . [¶] This broad interpretation of 'arising out of' applies to both coverage provisions and exclusions." (*The Travelers Property Casualty Co. of America v. Actavis, Inc.* (2017) 16 Cal.App.5th 1026, 1045.)

[14] "California courts have considered the term dishonesty within various statutory schemes and have relied on the common understanding as described in *Hogg v. Real Estate Commissioner* (1942) 54 Cal.App.2d 712, 717 . . . , involving fraud, deception,

excluded from coverage.  Thus, there was no potential that claims based on such conduct were covered under the policy.

The undisputed evidence before the trial court demonstrated that Highview's conduct was dishonest.  There was no evidence that Highview's use of the United.com site for the cancellation and refund was the result of an innocent mistake or a misunderstanding of the cancellation and refund process.  And, although Carlisle speculated that the unearned commissions were the result of a computer "glitch," it failed to cite any evidence showing that the ARC, Sabre, or United.com systems malfunctioned or broke down.  Instead, the evidence showed that those systems were purposely misused or manipulated by Highview to generate the unearned commissions.

In its correspondence with Berkshire, Carlisle claimed that Tzell was seeking to hold Carlisle liable for negligent supervision of Highview.  But even a claim based on Carlisle's negligence would have "arisen from" the dishonest conduct of Highview, without which there would have been no claim against Carlisle. (See *Century Transit Systems, Inc. v. American Empire Surplus Lines Ins. Co.* (1996) 42 Cal.App.4th 121, 128.)  Thus, any such negligence claim would also be excluded under paragraph O.

In its reply brief, Carlisle argues that Berkshire was required, but failed, to show that either Carlisle or Highview were "charged with, pled guilty to, pled nolo contendere to, or admitted to any dishonest, fraudulent, malicious, or criminal conduct."  But the exclusion in paragraph O makes no reference to requiring any such plea or admission.  Further, all of the

---

betrayal, faithlessness; absence of integrity; a disposition to cheat, deceive, or defraud.  [Citations.]" (*Chodur v. Edmonds* (1985) 174 Cal.App.3d 565, 570.)

reasonably inferable facts upon which Berkshire based its denial of a defense demonstrated that Highview's receipt and retention of the unearned commissions were dishonest acts, regardless of whether they were also the basis for a criminal prosecution.

## C.  *First Cause of Action:  Breach of Contract*

The breach of contract cause of action was based on alleged breaches of two policy provisions, the defense provision and the supplementary payments provision.[15]  Because we have concluded that Berkshire was not required to provide a defense under the terms of the policy, we discuss here only whether Berkshire was entitled to summary adjudication on the breach of contract claim based on the supplementary payment provision.

On that provision, Carlisle contends that the trial court erred by concluding the issue was moot in light of its ruling that Berkshire had no duty to defend.  Berkshire counters that because its duty to make supplementary payments was limited to claims "'to which this insurance applies,'" there was no breach, as the policy did not apply to the United and Tzell claims.  In the alternative, Berkshire contends that its offer to pay for Carlisle's

---

[15]    As noted, Carlisle argues that Berkshire had a duty of investigation, but does not link that duty to any specific cause of action.  As Carlisle concedes, in the contract context, the duty arises, if at all, from the implied covenant of good faith and fair dealing.  But Carlisle did not allege in its contract claim a breach of the implied covenant of good faith and fair dealing based on that duty; it alleged that Berkshire breached the express terms of the policy.  We therefore do not consider the duty to investigate issue in reviewing the trial court's ruling summarily adjudicating the contract claim in Berkshire's favor.

time under the provision was limited to the time it spent responding to specific requests for information, not the entire time Saxe spent on the claims. Because Berkshire paid the hours Saxe invoiced for time spent in responding to Berkshire's questions, Berkshire maintains that it did not breach the supplementary payments provision.

We agree with Berkshire that there is no factual dispute as to whether it breached the supplementary payments provision. The provision itself limited Berkshire's responsibility to make supplementary payments "with respect to any [c]laim to which this insurance applies." Having concluded that the policy did not apply to the Tzell and United claims, we also conclude that Berkshire, by refusing to pay the entirety of the invoice sought by Carlisle, did not breach the supplementary payments provision.

D. *Third Cause of Action: UCL Violations*

1. <u>Background</u>

Carlisle specified only two unlawful business practices in support of its UCL claim, namely, Berkshire's failure to adopt written standards for the prompt investigation and processing of claims and its failure to attempt in good faith to settle the United and Tzell claims.

In its motion, Berkshire argued that because it had no duty to defend the claims, Carlisle could not have suffered actual harm from the alleged unlawful practices. Berkshire thus maintained that, even if Carlisle incurred attorney fees defending the claims, any such harm was not the result of the alleged unlawful practices. Because such actual harm or injury is a prerequisite to

23

standing under the UCL,[16] Berkshire argued that Carlisle could not pursue a claim under that statute. In the alternative, Berkshire argued that Carlisle was not entitled to an injunction because the alleged violations had no impact on the general public and Berkshire had an adequate remedy at law.

In its motion for summary adjudication, Carlisle argued that Berkshire had a duty under common law and the Insurance Code to deny coverage within 40 days and cited California Code of Regulations, title 10, section 2695.7, subdivision (b)(1) in support.[17] And, in its opposition to Berkshire's motion, Carlisle argued that its UCL claim sought an injunction to prevent Berkshire's "systemic disregard of California common law, statutory, and regulatory obligations." According to Carlisle, it suffered the actual harm necessary to establish standing to obtain an injunction because it was required to retain counsel and incur unnecessary attorney fees.

---

[16] To establish standing to bring a claim under the UCL, a party must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury*, and (2) show that that economic injury was the result of, i.e., *caused by*, the unfair business practice or false advertising that is the gravamen of the claim." (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 322.)

[17] California Code of Regulations, title 10, section 2695.7, subdivision (b) provides: "Upon receiving proof of claim, every insurer . . . shall immediately, but in no event more than forty (40) calendar days later, accept or deny the claim, in whole or in part. The amounts accepted or denied shall be clearly documented in the claim file unless the claim has been denied in its entirety."

2.    Analysis

In its opening brief, Carlisle does not directly address whether it had standing to pursue its UCL claim and instead raises only one argument, namely, that reversal is required by the law of the case doctrine.  According to Carlisle, the trial court's ruling on the UCL claim violated that doctrine because it was contrary to the "previous direction" in our order on Carlisle's petition for writ of mandate.  We disagree.

The law of the case doctrine provides that a "'decision of an appellate court, stating a rule of law necessary to the decision of the case, conclusively establishes that rule and makes it determinative of the rights of the same parties in any subsequent retrial or appeal in the same case.'  [Citation.]  . . .  [T]he doctrine does not apply to points of law that might have been, but were not determined on the prior appeal.  [Citations.]" (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 301–302.)

In its initial ruling granting judgment on the pleadings, the trial court ruled, as a matter of law, that "[i]n a coverage matter there is no [UCL] claim available to the insured, . . ." citing *Moradi-Shalal, supra*, 46 Cal.3d 287.  In our order on the writ petition, we concluded that, as a matter of law, an insured could bring a UCL claim as part of a coverage action, citing *Zhang, supra*, 57 Cal.4th at page 369.

In its subsequent ruling adjudicating the UCL claim, the trial court, citing its legal conclusion that Berkshire had no duty to defend, explained that because there was no such duty in this case, Carlisle could not base its unlawful practices claim on conduct that constituted a breach of that duty and there was insufficient evidence for any other claim of an unlawful business

practice. That determination resolved an issue that was not before us on the writ petition. At the time we issued our order on Carlisle's writ, the trial court had not concluded that Berkshire had no duty to defend; it had instead incorrectly ruled, as a matter of law, that an insured like Carlisle could not base a UCL claim on conduct that violated Insurance Code section 790.03, regardless of whether that conduct also violated other laws or policies. Thus, the court's subsequent ruling summarily adjudicating the UCL claim did not violate the law of the case doctrine. We therefore affirm that ruling as Carlisle has failed to affirmatively demonstrate in its opening brief that it was erroneous.

In its reply brief, Carlisle additionally asserts that it had standing to assert a UCL claim because it suffered economic loss in the form of premium payments and attorney fees incurred in defending the claims, presumably due to Berkshire's failure to timely and thoroughly investigate the claims. Generally, we do not consider arguments raised for the first time in reply. (*United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 158.) But even if we were to address Carlisle's argument, we would reject it because Carlisle failed to show that the premiums and attorney fees it paid were the result of Berkshire's failure to promptly and thoroughly investigate the claims.

In its motion for summary adjudication, Carlisle argued that Berkshire had a statutory duty to promptly investigate and respond to claims within 40 days and that it breached that duty when it denied the claims more than 40 days after tender. Assuming for the sake of argument that it was an unlawful business practice under the UCL for Berkshire to take longer than 40 days to deny the claims, Carlisle failed to show any

premiums or fees that it incurred as a result of that practice. Its evidence of premium payments consisted of a declarations page from the policy with the annual premium amounts blacked out, with no explanation how any portion of the annual premium for the policy period was attributable to the alleged delay in denying the claims. Similarly, its attorney fees evidence consisted of Saxe's statement that, due to Berkshire's failure to defend, he was forced to hire counsel to defend the claims, again with no explanation of the fees, if any, that were the result of the delayed response.

E.    *Carlisle's Motion*

Because we affirm the trial court's granting of summary judgment on all of the claims in Carlisle's complaint, its challenge to the court's denial of its motion for summary adjudication of certain duty issues is moot. (See *Lockaway Storage v. County of Alameda* (2013) 216 Cal.App.4th 161, 174–175.)

# V.    DISPOSITION

The judgment is affirmed.  Berkshire is awarded costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KIM, J.

We concur:

RUBIN, P. J.

MOOR, J.